ORLANDO TOMPKINS & another *vs.* THOMAS E. HALLECK.

Suffolk.    January 27. — May 15, 1882.

The representation of a dramatic work, which the proprietor has never caused to be printed and has not obtained a copyright of, if made without license of the proprietor, is a violation of his right, and may be restrained by injunction, although such representation is from a copy obtained by a spectator attending a public representation by the proprietor for money, and afterwards writing it from memory.

DEVENS, J.    This is a bill in equity to restrain the defendant from representing at his theatre in Boston a drama called "The World," and for further relief.

It appears from the report of the judge who heard the case that this drama was originally composed in England, where, after being presented, it was sold to one Colville in New York, who caused it to be altered and amended, to suit the presumed taste of an American audience, by one Stevenson. It was successfully represented at Wallack's Theatre in New York, and was then assigned to the plaintiffs, with the exclusive right to represent the same in the New England States. The drama does not

appear ever to have been copyrighted or printed. While represented at Wallack's Theatre, one Byron and one Mora attended the representation, on three or more occasions, with the intent of copying and reproducing the drama as there enacted. Byron committed as much of the play as he could to memory, and, after each performance, dictated it to Mora until the copy was completed. It was not shown that either took any notes or written memoranda in the theatre. Byron subsequently made an agreement with the defendant to produce the same; and, against the remonstrance of the plaintiffs, who informed him of their ownership, it was advertised and produced by the defendant at his theatre, known as the Alhambra. As produced by the defendant it was called " The World," and is found to be in all substantial particulars identical with the plaintiffs' drama of the same name.

It being found by the judge who heard the cause that the dialogue and incidents of the drama were acquired by memory by Byron, who visited Wallack's Theatre sufficiently often for that purpose, that no written or stenographic minutes were made either by him or Mora in the theatre, and that there was no violation of any trust or confidence reposed in them by the plaintiffs or their assignors, he ruled that no injunction could issue; but, at the request of the plaintiffs, reported the case for the consideration of the full court. If the ruling is sustained, the bill is to be dismissed; otherwise, an injunction is to issue, and the case to be referred to a master for the assessment of damages.

These facts bring the case clearly within the principles decided in *Keene* v. *Kimball*, 16 Gray, 545; and it is frankly admitted by the counsel for the plaintiffs that, unless that decision shall be reconsidered and reversed, no injunction can issue according to the prayer of the bill. The question decided in *Keene* v. *Kimball* had never until then been directly determined in any reported case. It had been discussed with great ability by Judge Cadwalader in the Circuit Court of the United States for the Eastern District of Pennsylvania, where a decision of it was not necessary in order to dispose of the case before him. *Keene* v. *Wheatley*, 9 Am. Law Reg. 33. Adopting the views there expressed, it was held in *Keene* v. *Kimball* " that the literary

proprietor of an unprinted play cannot, after making or sanction-
ing its representation before an indiscriminate audience, maintain
an objection to any such literary or dramatic republication by
others as they may be enabled, either directly or secondarily, to
make from its being retained in the memory of any of the audi-
ence." The case of *Keene* v. *Kimball* has not since been re-
affirmed here, nor, so far as we are aware, elsewhere, nor has it
been distinctly denied by the decision of any adjudicated case,
except that of *French* v. *Conelly*, decided by the Superior Court
of New York, which is not the final tribunal in that State.
1 N. Y. Weekly Dig. 196. The defendants were there charged
with representing an unprinted play, "Around the World in
Eighty Days," in violation of the rights of the plaintiff. They
sought to maintain a defence upon the ground that they had
themselves dramatized the story from Jules Verne's work of the
same name. They were unsuccessful in this, and, it having
been proved that the copy used by them was obtained by the
memory of individuals after witnessing its public representation,
an injunction was issued restraining the defendants from further
representing it.

An examination will show various and conflicting opinions ex-
pressed by jurists, as well as by text-writers of high respectabil-
ity, upon the question involved. *Keene* v. *Clarke*, 5 Rob. (N. Y.)
38. *Palmer* v. *DeWitt*, 2 Sweeny, 530; 7 Rob. (N. Y.) 530;
36 How. Pr. 222; and 47 N. Y. 532. *Crowe* v. *Aiken*, 2 Biss.
208. *Shook* v. *Rankin*, 6 Biss. 477. *Boucicault* v. *Fox*, 5 Blatchf.
C. C. 87. Drone on Copyright, 558–564.

In view of this contrariety of opinion, it is not an unreason-
able request on the part of the plaintiffs that the question
involved should be re-examined, in order that the court may
consider whether the decision in *Keene* v. *Kimball* expresses
correctly the rights of parties, and gives to the proprietors of
unpublished plays the full protection to which they are entitled.

The St. of 8 Anne, *c.* 19, which is the foundation of the English
copyright law, while it included plays and dramatic compositions,
protected the author in his exclusive right to publish in print,
but not in that of public representation of his work. It has
since been modified by the St. 3 & 4 Will. IV. *c.* 15, and subse-
quently by that of 5 & 6 Vict. *c.* 45. The U. S. St. of February

3, 1831, was similar in this respect to the original English law, and, like it, has been so changed by the U. S. St. of August 18, 1856, that protection in the exclusive representation is now afforded where the play is published in print. It is perhaps somewhat remarkable that protection in the right of exclusive representation was not afforded by the St. of 8 Anne, *c.* 19, which is said in *D'Almaine* v. *Boosey*, 1 Y. & C. Ex. 288, by Lord Lyndhurst, to have been one of the most laboriously considered acts ever passed by the British Parliament. Although the result of the petitions of the English booksellers, it was submitted to, and carefully examined and passed upon by, committees of which many distinguished literary men were members. When it is remembered that among these were such dramatic writers as Addison and Steele, it would seem that this right would have been carefully guarded.

Dramatic compositions differ from other literary productions not intended for oral delivery in this, that they have two distinct values, each worthy of protection ; — that which they have as books or publications for the reader, and that which they have by reason of their capacity for scenic representation. They are works, in prose or poetry, in which stories are told or characters represented both by conversation and action. Some are poems cast in a dramatic form, capable of representation upon the scene rather than adapted to it, and whose most valuable characteristic is their purely literary merit. Others, of but slight literary pretensions, and affording but little satisfaction in the perusal, are found agreeable in representation from the spirited development of the story which is told in action, the vivacity and interest of the events displayed, even if the conversations of the imaginary characters, out of this connection, would appear tame and unattractive. The most perfect are those which, like some of the tragedies of Shakespeare, as Hamlet or Macbeth, are adapted alike to the library and the stage, and which address themselves more agreeably to those who read or those who hear, as such persons themselves differ in their respective capacities for enjoyment.

That the right of property which an author has in his works continues until by publication a right to their use has been conferred upon or dedicated to the public, has never been disputed.

If such publication be made in print of a work of which no copyright has been obtained, it is a complete dedication thereof for all purposes to the public. *Wheaton* v. *Peters*, 8 Pet. 591. *Stevens* v. *Gladding*, 17 How. 447. If of a work of which a copyright has been obtained, it is so dedicated, subject to the protection afforded by the laws of copyright, the author accepting the statutory rights thereby given in place of his common-law rights. But the representation of an unprinted work upon the stage is not a publication which will deprive the author or his assignee of his rights of property therein. *Roberts* v. *Myers*, U. S. C. C. Mass. Dist. 23 Law Rep. 396. It will not interfere with his claim to obtain a copyright therefor. *Keene* v. *Kimball*, *ubi supra*. Nor will it deprive him of his power to prevent a publication in print thereof by another. *Macklin* v. *Richardson*, Ambl. 694.

Nor can we perceive why it should deprive him of his right to restrain the public representation thereof by another. It is said, indeed, in *Keene* v. *Kimball*, that the court is not aware of any case then existing, either in England or America, " in which the representation of a play has been restrained by injunction, where no copyright had been acquired, and where the proprietor had permitted its public representation for money, except the case of *Morris* v. *Kelly*, 1 Jac. & Walk. 481," the authority of which is doubted, it being deemed impossible to reconcile it with the earlier case of *Coleman* v. *Wathen*, 5 T. R. 245, or with the subsequent decision in *Murray* v. *Elliston*, 5 B. & Ald. 657. This statement, taken in connection with the general terms in which the conclusion of the court is expressed, at the end of the opinion, — " that the representation by the defendant of a dramatic work, of which the proprietor has no copyright, and which she had previously caused to be publicly represented and exhibited for money, is no violation of any right of property, although done without license from such proprietor, and, as it does not appear to have been done in violation of any contract or trust, cannot be restrained by injunction," — would indicate that, in the view of the court, even if a copy were obtained, either by notes, writing or stenography, although the copy was in fact obtained in the case then adjudicated by means of memory alone, there might properly be a subsequent public representation by the

possessor of such a copy. In this view, public representation is treated as a complete dedication of such a work for that purpose to all who can obtain in any way, from the representation itself, a copy thereof.

The case of *Coleman* v. *Wathen, ubi supra,* was an action brought, by the owner of the copyright of O'Keefe's farce called " The Agreeable Surprise," against the manager of a theatre in Richmond, on account of its performance, for the penalty imposed by the St. of 8 Anne, *c.* 19, as for an unauthorized publication. The verdict having been in his favor, it was set aside upon the ground that the only publication by which the statutory penalty could be incurred was a publication in print. It was argued by Mr. Erskine, for the plaintiff, that, independently of the statute, there was a common-law right, by which the author had an exclusive property in his works; but it is obvious that this portion of his argument had little relevancy in an action for a penalty imposed by statute. The case was heard in 1793, before Lord Kenyon and Mr. Justice Buller, and may be dismissed as having no bearing upon an inquiry as to the rights of a person to be protected against the unauthorized representation of a play of which no copyright has been obtained.

The case of *Morris* v. *Kelly, ubi supra,* was that of a bill filed in 1820 by the proprietor of another farce of O'Keefe for an injunction to prevent its performance at a rival theatre. The play was one which had been long performed and had been copyrighted, but had never been printed by authority of the author or proprietor, or otherwise published than by representation. An injunction was granted by Lord Eldon. The report of the case is very brief, and no opinion of the Lord Chancellor is preserved, which is much to be regretted, as his discussion of the question involved would have been of value.

In 1822, Mr. Murray, the publisher and owner of the copyright of Lord Byron's tragedy of " Marino Faliero," who had printed and published it for sale, applied for an injunction to restrain Mr. Elliston, the manager of Drury Lane Theatre, from representing it in an abridged form on the stage of that theatre. The injunction was granted by Lord Eldon, who sent to the King's Bench the question whether the plaintiff could, under such circumstances, maintain an action against the defendant for

publicly representing the tragedy thus abridged; and that court
certified its opinion in the negative. *Murray* v. *Elliston, ubi
supra.* As no opinion was delivered, it is impossible to ascertain
upon what ground the decision of the Court of King's Bench was
placed. It may have been upon the ground that the abridgment
was a fair one, and that thus no invasion of the author's rights
had been committed, the English law being extremely liberal to
one who abridges the work of another. It may have been upon
the ground that, as there had been a publication in print, there
was no redress for an unauthorized theatrical representation, or
upon the ground that there was no such redress in any case where
the party had copyrighted his play, as he then accepted the pro-
tection which the statute afforded, in lieu of any which he
might have at common law. If decided upon the latter ground,
the case is not reconcilable with that of *Morris* v. *Kelly*, and this
for the reason that, meagre as the report is, it clearly appears
upon examination that the play which was there the subject of
controversy was one of which a copyright had been obtained.
Were it otherwise, the cases could well stand together.

" After the decision of *Murray* v. *Elliston*, 5 B. & Ald. 657,"
says Lord Denman in *Russell* v. *Smith*, 12 Q. B. 236, " it seems
to have been considered that publication to an audience was not
within the provision of the acts relating to copyright: conse-
quently St. 3 & 4 Wm. IV. *c.* 15, was passed, and, in respect to
dramatic literary property, gave to authors the profits arising
from publication by representing the piece on the stage."

These three cases, relating to plays in which copyrights ex-
isted, and the rights to representation which proprietors possess
in such plays, have but little bearing upon the inquiry whether
the owner of a play which is unprinted, and of which he has
no copyright, who has exhibited it for money, may be protected
from public representation thereof by another.

The case of *Macklin* v. *Richardson*, Ambl. 694, decided in
1770, is of much more importance in this connection. The
plaintiff was the author of a farce called " Love à la Mode,"
which had never been printed or copyrighted. It had been
performed under his direction, and also by his authority, for
which he received compensation. Great care was taken by him
of the manuscript, which was always kept in his own possession.

The defendants, who were proprietors of a journal, employed a stenographer, who took down the words of the play, and his copy as written out was afterwards corrected by one of the proprietors of the journal, who published one act in their journal, and advertised the publication of the remainder in their next number. Upon application to the Lord Chancellor, an injunction forbidding such publication was issued, which was afterwards continued until the final hearing. When the case came on for final hearing, the Great Seal was in commission, and the injunction was made perpetual by the Lords Commissioners. " It can scarcely be necessary," to use the words of Judge Cadwalader in *Keene* v. *Wheatley*, " to refer to *Morris* v. *Kelly*, or any other case, to show that, on the principle of this decree, the performance of Love à la Mode at another theatre, from the short-hand writer's report, would also have been prevented by an injunction."

Postponing for a moment the question as to what is unlawfully obtaining a copy of a play which has not been copyrighted, and which has been exhibited for money, and whether there is a distinction · between the representation from a copy obtained by memory and from one obtained by stenography or similar means, the proposition that the representation of such a play, the copy of which has been unlawfully obtained, will be restrained by injunction, is certainly supported by much authority since the case of *Keene* v. *Kimball* was decided, nor has it been controverted by the adjudication of any case. *Boucicault* v. *Fox, ubi supra. Shook* v. *Daly,* 49 How. Pr. 366. *French* v. *Maguire,* 55 How. Pr. 471. *Shook* v. *Rankin, ubi supra. Crowe* v. *Aiken, ubi supra. Palmer* v. *De Witt, ubi supra. Boucicault* v. *Wood,* 2 Biss. 34.

In *Crowe* v. *Aiken, ubi supra,* it was held that the author's rights in a manuscript play, of which no copyright had been obtained, were in no manner affected or limited by the acts of Congress as to copyright, and that, although previously performed, an injunction against an unauthorized performance would be granted. In giving the opinion of the court, Judge Drummond remarks, " I am also of opinion that, as the law now exists in this country, the mere representation of a play does not of itself dedicate it to the public, except, possibly, so far as those

who witness its performance can recollect it, and that the spec-
tators have not the right to secure its reproduction by phono-
graphic or other verbatim report, independent of memory."
The play in question was one written by Taylor, and known
as "Mary Warner." As, upon the evidence, it was found as a
fact by the court that the copy was obtained by a short-hand
reporter, it did not there become necessary to consider whether
that which is stated as a possible exception actually was one.

In *Keene* v. *Kimball*, it is said that it is not intended "to
intimate that there is any right to report, phonographically
or otherwise, a lecture or other written discourse, which its
author delivers before a public audience, and which he desires
again to use in like manner for his own profit, and to publish
it without his consent, or to make any use of a copy thus
obtained." But no distinction can be made between works
cast in the dramatic form and other literary productions in-
tended for public delivery to those who pay a suitable compen-
sation for the amusement or instruction they expect to obtain.
The right to be protected against the unauthorized representa-
tion of a dramatic work is in principle the same as the right to
be protected against the unauthorized oral delivery of a public
lecture. An ingenious argument was indeed made in *Keene* v.
*Kimball*, derived from the principles and ideas of the Puritan
founders of the Commonwealth, that a dramatic composition
was not equally under the protection of the law with other lit-
erary works; but it was held by the court to be quite clearly
otherwise.

The late Mr. Charles Dickens was an accomplished public
reader of selections from his own works. If he had selected a
story which had never been published or copyrighted, according to
the suggestion above quoted from *Keene* v. *Kimball*, there would
have been no right on the part of an auditor to report it, phono-
graphically or otherwise, so as to avail himself of the copy by a
subsequent oral delivery by himself or another to whom he might
transfer it. The genius of Mr. Dickens was essentially dramatic;
if he had seen fit to prepare and read himself, as he might have
done, a drama, representing its various characters, such a literary
production would not have been any less protected than a written
discourse or lecture. Nor can it be perceived that, if, instead of

reading such a drama himself, he had permitted it to be represented on the stage, which is but a reading by several persons instead of one, accompanied by music, scenery, and the usual accessories of the stage, his rights as an author to protection would be in any way diminished. *Boucicault* v. *Fox, ubi supra.*

The decision in *Keene* v. *Kimball* must be sustained, if at all, upon the ground that there is a distinction between the use of a copy of a manuscript play obtained by means of the memory or combined memories of those who may attend the play as spectators, it having been publicly represented for money, and of one obtained by notes, stenography, or similar means, by persons attending the representation; — that in the former case the unauthorized representation of the play would be legal, while in the latter it would not be.

The case of *Keene* v. *Kimball* involved a controversy as to the right to represent the same play, the right of representing which was involved in *Keene* v. *Wheatley, ubi supra.* It was " The American Cousin ; " to use the language of the answer in *Keene* v. *Wheatley*, " a piece presenting, in suitable situations, those eccentricities usually attributed on the stage to Yankees ; " and appears to have had much success, both on this account, and as presenting those absurdities usually attributed on the stage to the exquisite or dandy. In *Keene* v. *Wheatley*, the controversy was as to the title to the play as a literary production, as it then existed, it having been in some parts curtailed, and having also received certain additions, both written and unwritten, and also as to the mode in which the defendant obtained it. It was deemed to be proved that the play in its existing form was the property of the plaintiff, and that the defendants had obtained their acting copy from her by a breach of confidence on the part of an actor employed by the plaintiff, who had communicated it to the defendants ; and that the plaintiff was therefore entitled to an injunction.

The opinion of the Circuit Court, as delivered by Judge Cadwalader, is a very elaborate discussion of the whole subject of literary property, and embraces many questions not involved in the judgment of the case. Among these is included the question, whether a public representation will authorize another, who may obtain a copy by memory, to afterwards

represent the play so performed.   The theory advanced by him, which was apparently original, and in support of which he cites no adjudicated case, is that the act of public performance of a play is a general publication; and that, "when a literary proprietor has made a general publication in any of the modes which have been described, other persons acquire unlimited rights of republishing in any modes in which his publication may directly or secondarily enable them to republish."   If this be correct to the full extent of the proposition, the manner in which a copy is obtained for other representations must be unimportant, as the right to subsequently represent is made to rest upon the fact that there has been a public representation.   But in order that the play shall be thus represented, he contends that a copy must be obtained by "fair means."   Those which he defines as "fair means" are the impressions on the memory of some persons whose constant attendance at the performance of the play may enable them to write or repeat elsewhere that which they have heard; but he holds that no one may lawfully make use, for this purpose, of stenography, writing or notes.   According to the facts as they were proved in *Keene* v. *Kimball*, by the allegations of the bill and the admission of the demurrer, the copy there used for representation was obtained solely by memory.

Judge Cadwalader further remarks, "that the manager of a theatre may prevent a reporter from noting the words of such a play phonographically or stenographically, or otherwise.   As one of the audience, he would, in doing so, transgress the privileges conceded in his admission.   But the privileges of listening and of retention in the memory cannot be restrained.   Where the audience is not a select one, these privileges cannot be limited in either their immediate or ulterior consequences."   The effect of this argument is, that as the privilege of listening is conceded, and as memory cannot be restrained, any use of memory would be legitimate; and that a spectator, either alone or acting in concert with others, if able to carry away in memory the contents of a play, acquires a lawful right to make any use of the play he chooses, however destructive to the literary property of its author.

Adopting the views of Judge Cadwalader, it is said in *Keene* v. *Kimball*, that, "if persons, by frequent attendance at her"

(the plaintiff's) "theatre, have committed to memory any part or the whole of the play, they have a right to repeat what they heard to others." The repetition thus contemplated as rightful, as shown by the sentence heretofore quoted from the same opinion, is by public representation of the play so committed to memory. It is added, "We know of no right of property in gestures, tones, or scenery, which would forbid such reproduction of them by the spectators as their powers of imitation might enable them to accomplish."

The theory that the lawful right to represent a play may be acquired through the exercise of the memory, but not through the use of stenography, writing or notes, is entirely unsatisfactory. "The public," it is true, as is said in *Keene* v. *Kimball*, "acquire a right to the extent of the dedication, whether complete or partial, which the proprietor has made of it to the public." But the question is as to the extent of that dedication. It is not easy to understand why the author, by admitting the public to the performance of his manuscript play, any more concedes to them the right to exercise their memory in getting possession of his play for the purpose of subsequent representation, than he does the privilege of using writing or stenography for that purpose. Drone on Copyright, 568, 569. The spectator of a play is entitled to all the enjoyment he can derive from its exhibition. He may make it afterwards the subject of conversation, of agreeable recollection, or of just criticism, but we cannot perceive that in paying for his ticket of admission he has paid for any right to reproduce it. The mode in which the literary property of another is taken possession of, cannot be important. The rights of the author cannot be made to depend merely on his capacity to enforce them, or those of the spectator on his ability to assert them. One may abandon his property, or may dedicate it to the use of the public; but while it remains his, the fact that another is able to get possession of it in no way affects his rights.

If the performance of a manuscript play is not a complete dedication to the public, (and from the time of the decision in *Macklin* v. *Richardson*, *ubi supra*, there is no case known to us which has so held,) subsequent performances by others, whether they obtain their copies by memory or by stenography,

are alike injurious. Cases are not unknown of memories so tenacious that their possessors could, by attending one or two representations, retain the text of an entire play ; and the dramatic profession is one in which the faculty of memory is highly cultivated. There is no reason why the exercise of this faculty should be in any way restrained : it is not that the spectator learns the whole play which entitles the author to object; it is the use that is sought to be made of that which is learned that affords just ground of complaint. "Such use," as remarked by Judge Monell, "is as much an infringement of the author's common-law right of property, as if his manuscript had been feloniously taken from his possession." *Palmer* v. *De Witt*, 2 Sweeny, 558.

Following the decision in *Keene* v. *Kimball*, the judge who presided at the trial of the case before us held that, although the copy of the drama called "The World" was obtained by the memory of persons who formed part of the audience, who attended the performance for the purpose, who wrote out a manuscript, comparing their recollections, and testing them by subsequent visits to the performance, as no violation of trust or confidence was shown, no injunction could be granted. But the acts done by these persons, like those proved in *Keene* v. *Kimball*, were, as we view them, in a legal sense violations of contract and confidence. The author had a right to believe that, in purchasing their tickets of admission, these persons did so for the pleasure or instruction that the performance of his drama would afford, and that they did not do so in order to invade his privilege of representation, which, as it was of value, he must have desired to preserve.

The lectures of an accomplished medical professor are of high pecuniary value. They are repeated from year to year before different classes, with only such changes as advancing science may require, or such new illustrations as experience may dictate. The student is not only permitted, but invited, to take written notes. He is entitled to all the instruction he can obtain from the lectures, using both notes and memory to retain it; he may employ the information he has derived in his practice; he may reproduce it in his own discourses, with such other information as his education or experience may give him, should he desire

himself to discuss a similar subject; but he cannot therefore orally deliver or publish in print the lecture of which he has been an auditor.

Where persons are admitted, as pupils or otherwise, to hear public lectures, it is upon the implied confidence and contract that they will not use any means to injure or take away the exclusive right of the lecturer in his own lectures, whether that be to publication in print or oral delivery. *Abernethy* v. *Hutchinson,* 3 L. J. Ch. 209, was a bill brought by the celebrated surgeon Abernethy to restrain the defendants from publishing his lectures. It was held by Lord Eldon, that, while those pupils who were rightfully admitted to the lectures might take them down for their own information, they could not publish them for profit, or sell them to others to publish. *Bartlette* v. *Crittenden,* 4 McLean, 300, goes even further. It was there held that an author did not dedicate his manuscript to the public by using it to instruct others; and that, even if he permitted his pupils to take complete copies, they could not use such copies for publication. In these cases, there was nothing wrongful in obtaining or keeping possession of the copies which had been permitted; it was the use sought to be made of them that was restrained. The implied contract of the author of a play, which is not printed or copyrighted, with the spectator, is closely analogous to that of the lecturer with his pupil. It is a violation of contract and confidence when the spectator, obtaining possession of a copy of the drama, whether by memory, notes or stenography, undertakes to use it for publication in print, or for another public representation. 2 Story Eq. Jur. §§ 949, 950.

The special use of his play made by the author, for his own advantage, by a representation thereof for money, is not an abandonment of his property nor a complete dedication of it to the public, but is entirely consistent with an exclusive right to control such representation. *Roberts* v. *Myers, ubi supra.* If the spectator desires, there is no reason why he should not be permitted to take notes for any fair purpose; as, if he is a dramatic critic, for fair comment on the production, which is offered to the favorable consideration of the public; or, if a student of dramatic literature, for comparison with other works of its class. We should not be willing to admit that police arrangements

could be allowed to interfere with this, any more than with the taking of notes by one who attends a course of scientific lectures. The taking of notes in order to obtain a copy for representation is a different matter; it is the use intended to be made that renders it proper to restrain such an act. The ticket of admission is a license to witness the play, but it cannot be treated as a license to the spectator to represent the drama if he can by memory recollect it, while it is not a license so to do if the copy is obtained by notes or stenography. In whatever mode the copy is obtained, it is the use of it for representation which operates to deprive the author of his rights.

For the reasons stated, we are brought to the result that the decision in *Keene* v. *Kimball* cannot be sustained. The presiding judge having, at the hearing of this case, ruled in accordance with it, his decree must be reversed.

The plaintiffs are entitled to a decree restraining the defendant from exhibiting the play called "The World," and referring the case to a master to assess the damages sustained by them by reason of its unauthorized exhibition by the defendant.

*Decree reversed.*

*S. J. Thomas*, for the plaintiffs.
*D. F. Fitz*, for the defendant.