## THE "IOLANTHE" CASE.

### CARTE *v.* FORD and another.

*(Circuit Court, D. Maryland. February 21, 1883.)*

1. DEDICATION OF OPERA BY PUBLICATION OF UNCOPYRIGHTED SCORE AND LIBRETTO.

The non-resident alien authors of the comic opera of "Iolanthe," having sanctioned the publication in the United States of the libretto and vocal score, with a piano accompaniment, and having kept the orchestration in manuscript, *held*, that a person who had independently arranged a new orchestration, using for that purpose only the published vocal and piano-forte scores, could not be enjoined from publicly performing the opera with the new orchestration.

2. SAME—NEW ORCHESTRATION—INJUNCTION DENIED.

It appearing that the orchestration was a subordinate accessory of the opera, *held*, that the use of the composer's name and the title of the opera would not be enjoined, provided the announcements of the performance were not so worded as to mislead the public into believing that the original orchestration, of which complainant had exclusive use, was to be performed.

3. INJUNCTION GRANTED TO RESTRAIN MISLEADING ADVERTISEMENTS—FORM.

*Boosey* v. *Fairlie*, L. R. 7 Ch. Div. 301; *Goldmark* v. *Collmer*, Cir. Ct. Cook Co. Ill.; *Thomas* v. *Lennon*, 14 FED. REP. 849, commented on.

In Equity. Motion for preliminary injunction.

*Causten Browne* and *William F. Frick*, for complainant.

*Thomas W. Hall*, for respondents.

Before BOND and MORRIS, J. J.

MORRIS, J. The complainant, R. D'Oyly Carte, of London, claiming to be the owner by purchase from Gilbert & Sullivan of the exclusive right to give public performances in the United States of the comic opera of "Iolanthe, or the Peer and the Peri," files this bill asking, with other relief, an injunction restraining the respondents, who are citizens of the United States, from publicly performing with orchestral accompaniment, or giving any public operatic performance of, any opera containing the music, or any material or substantial part of the music, of said opera, or from announcing or advertising the public performance of any opera substantially as Gilbert & Sullivan's opera of "Iolanthe." The material facts involved in this controversy are substantially admitted, so that, although the motion now before us is for a preliminary injunction, it is practically a final hearing, and the question to be decided a naked question of law.

The facts are as follows:

Messrs. Gilbert & Sullivan, of London, are the composers of the opera of "Iolanthe," the subject of this controversy. It is a dramatic and musical composition, consisting of parts to be spoken and parts to be sung, with airs and harmonies for the voice parts, and an orchestral accompaniment for an orchestra or band of various musical instruments,—the words of the opera having been written by Gilbert and the music composed by Sullivan.

The authors caused the opera to be publicly performed for the first time in London on November 25, 1882, and the complainant having purchased the exclusive right to give public performances of it in the United States, produced the opera on the same date at the Standard theater, in New York.

The orchestration composed by Sullivan has been strictly kept in manuscript, copies having been furnished only to those employed or authorized either by the author or by the complainant to perform it. A full libretto of all the parts to be sung or spoken, with some indications of the proper action on the stage and a full score of all the voice parts to be sung, together with

an accompainment for the piano, and an arrangement of the overture for the piano, has been printed and sold to the public in the United States by J. M. Stoddart, to whom the authors have granted, so far as they could, the exclusive privilege of publishing this and certain others of their operas in this country.

Some weeks after the performance at the Standard theater, in New York, and after the publication of the printed score in this country, the respondent, Charles E. Ford, employed J. P. Sousa, leader of the Marine band, at Washington, to prepare for him an orchestral accompaniment for the published vocal score, which he did, relying solely upon his own skill as an arranger of orchestral music.

The respondent John T. Ford disclaims any connection with or interest in the matter, but the respondent Charles E. Ford admits that, using the orchestration so prepared, he has been for a month or more, and now is, giving public performances of the opera in many cities of the United States, and has advertised it as Gilbert & Sullivan's opera of " Iolanthe." He also states that he has in like manner obtained an orchestration of most of Gilbert & Sullivan's other comic operas as they appeared and were published, and has performed them with success in great numbers of places in this country.

The complainant charges that he has been injured in two ways: *First*, because Ford's company, by traveling ahead of the company authorized by him, and being the first to perform the opera in many places, forestall the performances licensed by him; and, *secondly*, because, as he alleges, the opera as given by Ford, without the original orchestration, is an inferior and incomplete performance, and the public being led to believe by Ford's advertisements that he is presenting the opera as played in London and New York, the reputation and success of the genuine work is injured.

From the admitted facts, then, it appears that every word of the libretto, the music for every voice part for every singer, including the choruses, and a piano-forte accompaniment for these, and a piano-forte arrangement of the overture, have been printed and are for sale to the public by the express authority of the authors. The only portion of the opera, as presented on the stage under the supervision of the authors, or those authorized by them, which has not been thus printed and published, is the orchestration composed by Mr. Sullivan, which he has retained in manuscript.

For the purposes of this motion it is conceded that the orchestration used by respondent was made by the musician employed by him for that purpose, who, taking the printed music, has, by his independent skill and labor, arranged the parts for the different instruments, which make up the orchestra employed by the respondent in the public performance of the opera as given by him. The respondent's orchestration not having been memorized or copied from the complainant's unpublished score, nor obtained from it in any surreptitious or

unauthorized manner, but having been arranged from an uncopyrighted published source, by the exercise of so much skill and labor as was required to make it, it is obviously so far an original work that it could itself be protected.

Under the copyright laws of the United States, (Rev. St. § 4952,) any citizen or resident of the United States who is the author of any dramatic composition (and doubtless this opera as an entirety would be held to be of that class) may copyright it, and he then has given him by the statute two distinct and separable rights,—one, the sole right to print and sell copies of the words and music, and the other, the sole right to publicly perform it; and, doubtless, he could assign to one person the right to print, and reserve to himself or grant to a different person the right to publicly perform his composition. But it is a proposition now so well settled as to be almost axiomatic, that, except so far as preserved to him by statute, when the composer of any work, literary, musical, or dramatic, has authorized its publication in print, his control over so much as he has so published, and of the use which others may make of it, is at an end. *Wheaton* v. *Peters*, 8 Pet. 591; Drone, Copyright, 101, 574, 577; *Boucicault* v. *Wood*, 2 Biss. 34; *Mark Twain Case*, 14 FED. REP. 728; *Tompkins* v. *Halleck*, 133 Mass. 32. And in the present case it could not be and it is not denied that it is the right of any one to publicly perform all that the book contains, which would in fact be the whole opera as composed by the authors, substituting the piano-forte accompaniment for the orchestra.

The complainant, however, contends that while the opera, as published, may be publicly performed with a piano-forte accompaniment, it must be with such an accompaniment *only*, and not with an orchestra; and that as some proper orchestration of the music, and its performance by an orchestra, are requisite to the successful public performance of the work as an opera, and as he has from Mr. Sullivan the sole right to use his unpublished orchestration in the United States, the opera practically cannot be publicly performed in the United States without his sanction.

It is earnestly contended in his behalf that the publication of the airs and harmonies with a piano-forte accompaniment is a dedication which is restricted to a performance with that accompaniment solely, and that it is a presumption of law that the authors intended to sell to the purchasers of the printed book only the right to use the contents as therein arranged, and not with an orchestration, because the orchestration was withheld; and that the use which the purchaser may

make of it should be restricted to what may be considered as reasonably within the contemplation of the parties—the one in selling and the other in buying the book. This, as a statement of the common-law doctrine of the restrictions imposed upon the use which may be made of an unprotected published composition, it must be admitted is novel. It would seem to be an attempt to extend and amplify the reasoning of the decision in the case of *Tompkins* v. *Halleck*, 133 Mass. 32, to reach this case.

In *Tompkins* v. *Halleck* the supreme court of Massachusetts held (overruling an earlier decision of that court) that the purchase of a ticket to witness the performance of an unpublished drama gave to the purchaser no right to publicly perform the drama, even if he should be able to carry away the whole of what he saw and heard by his unaided memory. And they so decided, because, as the public performance of a manuscript play had never been held to be a complete dedication of it to the public, and injunctions had always been granted to restrain the use of any copy of such a play, obtained surreptitiously from the manuscript, or by the abuse of any trust with regard to it, or of a copy taken down at the performance by a stenographer, the court was of opinion that the exception which had been allowed by judicial decisions to prevail in favor of a copy obtained by memorizing, was an unsatisfactory and illogical exception, not founded upon either reason or justice.

We have no inclination to doubt the entire correctness of the decision of the Massachusetts court, or that it will be generally accepted as an able and authoritative interpretation of the law, but we do not see the application of the decision or of any reasoning which supports it to a case like the present one. In that case the whole play was kept in manuscript—no part of it was in print and sold to the public—and the right to witness its performance could by no fair and reasonable implication be supposed to include the right to carry it away in the memory and set it up as a rival performance. But if a part of a play were printed and published without copyright, and certain parts considered essential to its entirety as a playing drama and to its success on the stage were kept in manuscript, *Tompkins* v. *Halleck* would not be an authority for holding that one could not take the published parts and by independent invention add what he thought suggested by them, and play what he had thus put together. On the contrary, the court distinctly adheres to the settled rule that the publication in print of a work of which no copyright has been ob-

tained, is a complete dedication of it for all purposes to the public. Page 36.

In the case before us, the right to publicly perform the opera with the piano accompaniment having been dedicated, why could not a violinist be employed to assist the piano, and so one by one be added all the instruments usually constituting an orchestra? At what point would the performance cease to be lawful and become piratical? Having enabled the purchaser of the book to publicly perform the opera, how can his manner of presenting it be restrained? Could not the words of the songs be set to other airs? Could not the opera be curtailed, the number of acts changed, or any other violence done to it? If so, why is it unlawful for any one to arrange an independent orchestration? The published libretto, airs, harmonies, and pianoforte score being now an unprotected source open to all who choose to take from it, how can Mr. Sullivan, in the absence of any statute applicable to his case, have any right to protection different from any non-resident alien who should independently make an orchestration and keep it in manuscript?

It is urged, and with force, that the orchestration of the composer is essential to the entirety of the opera as an artistic musical production, and that with the blundering or mechanical orchestration of another many of the musical conceptions and effects are frustrated, so that the opera presented to the public under the composer's name is not his, and is injurious to his reputation and to the success of his work. This may be good ground for restraining misleading advertisements and announcements, but is hardly an argument to support the doctrine of a restricted dedication, and an infringement by an independent orchestration. Cases may arise in which the printed publication may be so small a part of the whole musical composition that a court of equity might very properly restrain the use of the composer's name in connection with the proposed performance in any way calculated to deceive the public, and injure those having the right to perform the original score. To this ground of equitable jurisdiction and relief may, perhaps, be referred the case of *Thomas* v. *Lennon*, 14 FED. REP. 849, in which Judge LOWELL restrained a performance which was advertised as "Gounod's Redemption." But it seems to us that this is a ground of relief which would affect the advertisement rather the performance itself.

In this case the affidavits show that all the comic operas of Messrs. Gilbert & Sullivan, and noticeably "Pinafore," even when performed,

in this country without the orchestration in which the genius of Mr. Sullivan has set them, have had a popularity and success quite unprecedented, and have been heard with enjoyment by thousands of persons; and that as enjoyed by the vast majority of these persons, the musical niceties of the orchestration are quite subordinate to the wit of the libretto and the airs and harmonies of the voice parts,—the orchestration being indeed a subordinate accessory.

Our attention has been directed by complainant's counsel to *Boosey* v. *Fairlie*, L. R. 7 Ch. Div. 301, and 4 App. Cas. 726, as a case directly in point, in which the right to the full orchestral score of an opera was protected against an independent orchestration made from a published score for the piano and voices. We think, however, that the report of that case discloses that the court of appeal and house of lords of England so held because the acts of parliament and the convention with France gave to Offenbach, the author of the opera then in question, the sole liberty of publicly performing his opera for a limited period, without regard to whether it had been published or not. The principal question in the case very obviously was whether the requirements of the statute with reference to registration had been complied with. If Offenbach had properly registered his composition as required by the British statute, then the statute gave him the monopoly of its public performance, although he had already published every note of it. 4 App. Cas. 727.

There had been published in Paris, with the sanction of Offenbach, the score for the voice parts of the opera, with an arrangement for the piano by Soumis; and the proof showed that the greater part of the music of the defendant's opera was taken from this publication. It was not merely that the defendant had attempted to make for himself an independent orchestration, or had from the piano-forte arrangement of Soumis reconstructed the music of the opera, but he had taken the airs and harmonies of the opera from the published score. He had taken, as the court finds the fact to be, a substantial and material part of the musical composition, which Offenbach, if he had complied with the statute, had the sole right to publicly perform.

Therefore, when the court decided that Offenbach's opera had been properly registered, and that he was entitled to the monopoly given by the statute, there was no question as to the infringement. If the defendant was not entitled to publicly perform the airs and harmonies of Offenbach's operatic composition, of course the fact that he had arranged a new orchestration for them, or had derived them

from an arrangement already published, did not help his case, for the court had decided that under the statute a publication by Offenbach himself would not affect his monoply of public performance. Even if the court is to be considered as having held that the defendant's composition would be an infringement, although derived exclusively from the piano arrangement of Soumis and not all from the vocal score, the decisions in the two cases of *Reade* v. *Conquest*, 9 C. B. (N. S.) 755 and *Toole* v. *Young*, L. R. 9 Q. B. 523, show that the English courts recognize that the right of public performance given by their statute may be infringed by a substantially-identical composition derived by independent labor from a source which, but for the statute, would be held unprotected; under their statutory protection that is held to be an indirect copying, which, but for the statute, would be held to be an independent work derived from a common source. Drone, Copyright, 456, 458.

It is conceded by complainant's counsel that the propositions of law upon which the complainant's case must rest have but very recently received any judicial recognition in this country. The case of *Goldmark* v. *Collmer*, decided by Chancellor TULEY in November, 1882, in the circuit court for Cook county, Illinois, is one of two cases cited. The facts of that case, however, were quite different from this. There, although the songs and music, as arranged for the piano, had been published, the libretto had been kept in manuscript. The respondents were, therefore, properly restrained from using the unpublished libretto of the complainants, of which, in some manner, they had obtained possession. The learned chancellor hesitated to say that the defendant should be enjoined from making from the published piano score an independant arrangement for an orchestra, and was inclined to think that was one of the uses any one might make of the published score; but he was clear that the defendant should be restrained from using such an orchestration in the production on the stage of that opera of which he had no right to the libretto. In the opinion filed by the learned chancellor he goes much further, and insists that by the common law a composer has the right to have his opera represented on the stage with just that orchestration or combination of musical instruments which he has arranged for it, notwithstanding he has published a partial score; but we think that to the extent stated in the opinion this doctrine will be found in direct conflict with authoritative decisions.

The other authority in this country relied upon is the opinion by Judge LOWELL in *Thomas* v. *Lennon*, already cited. So far as the

decision of the learned circuit judge in that case goes upon the ground of deceptive advertisements calculated to mislead the public and injure the licensed performance, we do not doubt its correctness; but, so far as it may be used as an authority for the doctrine of a restricted dedication, we are unable, for the reasons already expressed, to concur in it.

In the present case, if we look at the publications themselves for any evidence of an intention to reserve any rights as not dedicated, there does not appear a single fact which points in that direction. The librettos sold by the respondent to the audiences at his performances are supplied to him by Stoddart, who publishes them with the express sanction of the authors. The book containing the music and words, with the overture and accompaniment arranged for the piano, is entitled "Iolanthe, or the Peer and the Peri; written by W. S. Gilbert; composed by Arthur Sullivan,"—with no mention at all of its being merely an arrangement to be performed on the piano; and the authority from the authors to Stoddart, printed on the title page, is an authority "to publish our operas" in the United States.

A case more bare of facts indicating an intention to reserve any rights could not well occur.

While we are clear that the opera, as performed by the respondent, is not an infringement of the composition which the complainant has the exclusive right to perform, we are of opinion that the absence of the composer's orchestration makes it a sufficiently different performance from that which was given in London and at the Standard theater, in New York, and from that which the complainant alleges is being performed by the companies licensed by him, to entitle the complainant to an injunction restraining advertisements or notices reasonably calculated to mislead the public in that respect to the complainant's injury, or calculated to induce the belief that the respondent's orchestration is that composed by Sullivan. To what extent and in what manner relief of this character is to be given by injunction must depend very much on the facts and equities of each case, and in the present case is not of importance, as the respondent has in his answer declared his intention, since objection has been made to the wording of his advertisements and play-bills, to so change them as to give the public all reasonable opportunity of being informed that his orchestration is not that of the composer of the opera.

BOND, J., concurred.

Subsequently, on motion of complainant, and without objection on the part of respondent, the following decree was passed:

This cause coming on to be heard, on the motion of the complainant, for a preliminary injunction, upon the bill, answer, affidavits filed by the respective parties, and the said cause having been argued by counsel and fully considered by the court,—

It is this seventh day of March, A. D. 1883, by the court here adjudged, ordered, and decreed that the bill of complaint be, and it is hereby, dismissed as to the defendant John T. Ford; and that the complainant is not entitled to an injunction against the defendant Charles E. Ford to the extent prayed for in this bill, but that he is entitled to a limited injunction restraining the said defendant Charles E. Ford, his agents and servants, from announcing or causing to be announced any public performance of Gilbert & Sullivan's opera of "Iolanthe," unless coupled with a reasonably-conspicuous announcement that the orchestral accompaniment used in such performance is not that composed by Sullivan; and from announcing or causing to be announced any public performance of said opera to be similar to that given in London or New York, unless coupled with a like announcement in reference to the orchestral accompaniment; and from posting or distributing any placards or show-cards of the opera of "Iolanthe," in substantial imitation of that put in evidence for the complainant, and marked "W. F. Morse, Standard theater," until the further order of the court in the premises.

And it is further ordered, adjudged, and decreed that each party, complainant and defendant, shall pay his own costs, to be taxed by the clerk.