WERCKMEISTER v. AMERICAN LITHOGRAPHIC CO. et al.

(Circuit Court of Appeals, Second Circuit. November 3, 1904.)

No. 185.

1. COPYRIGHTS—PLEADINGS—EVIDENCE.

Where, in a suit to restrain infringement of a copyright on a painting, defendant pleaded a subsequent exhibition of the painting at the Royal Academy in London as a publication thereof, and complainant took issue on the plea, evidence of restrictions on the exhibition of paintings at such exhibition, in that the public, other than members of the Academy and exhibitors and their families, were not entitled to admission, except on payment of an entrance fee, and that no permission to copy works during the exhibition could be granted, was competent as tending to negative the alleged publication.

2. SAME—EXHIBITION—PUBLICATION.

Under Rev. St. §§ 4952, 4955, 4962 [U. S. Comp. St. 1901, pp. 3406, 3407, 3411], authorizing copyrights of paintings, etc., and requiring notice of such copyright to be published thereon, the exhibition of an original copyrighted painting at an academy, at which no person was entitled to copy the same, and to which the public, other than the members of the academy, were not admitted, except on payment of a fee, without a notice of copyright thereon, did not constitute such a publication as avoided the copyright.

Appeal from the Circuit Court of the United States for the Southern District of New York.

For opinion below, see 126 Fed. 244. See, also, 117 Fed. 360.

Antonia Knauth, for appellant.

W. A. Jenner, for appellees.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

TOWNSEND, Circuit Judge. The suit was brought to restrain infringement of a copyright claimed by complainant in a certain painting called "Chorus." Said painting showed a convivial group of gentlemen gathered about a punch bowl, holding pipes and filled glasses in their hands, and singing in chorus. It is a meritorious work of art by Sadler, a British subject. The bill alleges that on or about April 2, 1894, Sadler assigned his right and title in any copyright obtainable on said painting by an instrument in writing to complainant, a citizen of Germany; that on April 16, 1894, and before publication, complainant duly obtained a copyright in this country, and on or about June 1, 1894, began the publication of said painting here and in foreign countries, and, being the proprietor of the copyright therein, he "has printed and continues to print therefrom copies of said painting, and has duly given notice of your orator's copyright" by inscribing upon a visible portion of every copy of said painting the word "Copyright" and name of party and date of copyright; and that the defendant the American Lithographic Company has infringed upon complainant's rights by printing great numbers of cheap copies of said painting for the purpose of advertising certain goods of the defendant the American Tobacco Company. The plea alleges that said painting —

"Was publicly exhibited by the author and proprietor thereof at the exhibition of the Royal Academy of Arts, held in the city of London, England, from

134 F.—21

the first Monday of May, in the year 1894, to the first Monday of August, in the same year, both days inclusive, and continuously during said period, and was during the whole of said period exhibited to the public and published, and that there was not at any time during the said exhibition, nor before, nor at any time since, any notice of the said copyright inscribed upon some visible portion of said painting, or on the substance on which the same was mounted, as required by the statute in such case made and provided, and that such exhibition and publication was with the knowledge, consent, and permission of the complainant and the said Sadler, the author and proprietor of said painting."

Complainant by replication took issue on the plea, and introduced testimony to prove, inter alia, certain restrictions upon the exhibition of paintings at the Royal Academy. This testimony showed that the public are not admitted to said exhibitions, except upon payment of an entrance fee, but that members of the Academy and exhibitors and their families are entitled to free admission, and that the following rule of the Academy is strictly enforced, namely:

"No permission to copy works during the term of the exhibition shall on any account be granted."

Sir Lawrence Alma Tadema, a member of the council of the Royal Academy, deposed that it was not the custom of artists who exhibited their pictures at the exhibitions of the Royal Academy to place any notices of copyright thereon or on the frame, and that he had never seen any such notices at said exhibitions, and that he knew from an experience of 30 years that neither visitors to the exhibition nor the public were allowed to make copies, or even notes, of the pictures thus exhibited, and that he understood that the Academy had no right to allow any copies to be made, but were expected to protect, and did protect, the rights of the exhibitor by the employment of persons to enforce said rule and otherwise.

Counsel for defendants contends that under the pleadings such testimony is immaterial and irrelevant. He invokes the familiar rule that no fact can be proved that is not pleaded, and contends that, the truth of the allegations of the plea having been put in issue without amendment of the bill before replication, no matter in avoidance of the plea is admissible. It is unnecessary to question the correctness of the general rule as thus stated. This principle has no application to the pleadings and proofs herein.

In the case of Horn v. Detroit Dry Dock Company, 150 U. S. 611, 14 Sup. Ct. 214, 37 L. Ed. 1199, cited by defendants, the proof established the truth of a plea of a receipt in full. Defendant admitted the correctness of the receipt, but sought to avoid its effect by evidence as to failure of consideration, mistake in its execution, and lack of mutuality. The court found that "the issue made by the replication was simply the existence of the receipt as set forth in the plea," and, that being established, the dismissal of the bill necessarily followed, as said matters were foreign to the issue presented by the pleadings. Here the plea alleged that the original painting was—

"Publicly exhibited by the author and proprietor thereof at the exhibition of the Royal Academy, * * * and published, * * * and that such exhibition was with the knowledge, consent, and permission of the complainant," etc.

The evidence introduced by complainant as to the conditions under which said painting was exhibited were not foreign to the issue. It was directly antagonistic to the allegation that the painting was published. The controlling question herein, in the view which we take of the law, is whether there was a publication of the painting. The defendants raised this issue by the plea, and thereby invited a presentation of the facts decisive of said question. The statutes provide as follows:

"Sec. 4962. That no person shall maintain an action for the infringement of his copyright unless he shall give notice thereof by inserting in the several copies of every edition published, on the title page or the page immediately following, if it be a book, or if a map, chart, musical composition, print, cut, engraving, photograph, painting, drawing, chromo, statue, statuary, or model or design intended to be perfected and completed as a work of the fine arts, by inscribing upon some visible portion thereof, or of the substance on which the same shall be mounted, the following words, viz.: 'Entered according to act of Congress, in the year ――――, by A. B., in the office of the librarian of Congress, at Washington;' or, at his option, the word 'Copyright,' together with the year the copyright was entered, and the name of the party by whom it was taken out; thus 'Copyright, 18――, by A. B.'" [U. S. Comp. St. 1901, p. 3411.]

"Sec. 4952. The author, inventor, designer or proprietor of any book, map, chart, dramatic or musical composition, engraving, cut, print or photograph or negative thereof, or of a painting, drawing, chromo, statue, statuary, and of models or designs intended to be perfected as works of the fine arts, and the executors, administrators or assigns of any such person shall, upon complying with the provisions of this chapter, have the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing and vending the same; and, in the case of dramatic composition, of publicly performing or representing it or causing it to be performed or represented by others; and authors or their assigns shall have the exclusive right to dramatize and translate any of their works for which copyright shall have been obtained under the laws of the United States." [U. S. Comp. St. 1901, p. 3406].

"Sec. 4955. Copyrights shall be assignable in law, by any instrument of writing, and such assignment shall be recorded in the office of the librarian of Congress within sixty days after its execution; in default of which it shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice." [U. S. Comp. St. 1901, p. 3407.]

The copyright in said painting was assigned to complainant, copyright was duly taken out by him prior to the publication alleged in the plea, and since said copyright was obtained the complainant has duly marked every copy published by him as "Copyrighted."

Counsel for defendants contends that said exhibition at the Royal Academy of the original painting, by the artist after complainant had obtained his copyright, without notice thereof upon said painting or its frame, constituted a publication, and therefore complainant was precluded from recovery by virtue of the provisions of the statute quoted above. Counsel further contends that the restriction on copying is immaterial, so long as the general public is admitted to view the painting. The questions thus presented have not been directly decided in the case of paintings, but it is believed that they may be determined by an examination of the history of the law of copyright, and by reference to the decisions of analogous questions arising in the case of books, lectures, and dramatic compositions.

A copyright is an incorporeal right to print and publish. Trustees v. Greenough, 105 U. S. 527, 530, 26 L. Ed. 1157. It is a property in notion, without corporeal, tangible substance. Miller v. Taylor, 4

Burr. 2303. This property is a different and independent right, detached from the corporeal property out of which it arises. Stephens v. Cady, 14 How. 528, 14 L. Ed. 528. Each of these is capable of existing and being owned and transferred independent of the other. Stevens v. Gladding, 17 How. 447, 15 L. Ed. 155. The recognition of the doctrine of a distinctive literary property has existed from very early times. 2 Lewis' Blackstone, 407. The senate of the republic of Venice in 1469 granted to one John of Spira the exclusive privilege for five years of printing the letters of Cicero and Pliny. Two Centuries Growth of American Law, 422. Blackstone considers this exclusive right of property as grounded on labor and invention and reducible to the head of occupancy. 2 Lewis' Blackstone, 405. The protection of the result may be considered as due to original acquisition. The conceptions which it represents are as free as the birds of the air or the wild beasts of the forest, but they belong to him who first reduces them to captivity. The Greeks reasoned that the perfect statue already existed in the block of marble, and that it required only the genius of the sculptor to develop its proportions. Copyright protects the captor of the idea, the genius of the sculptor, by giving him the exclusive property in his acquisition or creation.

To pursue the foregoing analogies, the common-law protection continues only so long as the captives or creations are kept in confinement or controlled. The statute permits them to go free and releases the restraint, provided the owner has stamped them with his brand. In either case the property of the owner is protected against appropriation without his consent. The common law protected copyright before publication. The statute supersedes the common-law right, and subject to certain conditions extends its protection after publication. The author of a work of art has at common law a property therein until it is published with his consent. He may withhold or communicate it, and in communicating it he may impose such restrictions upon its use as he sees fit. Drone on Copyright, 103; Parton v. Prang, 3 Cliff. 548, Fed. Cas. No. 10,784. The right to make copies before publication and the right of first publication are common-law rights. The right to multiply copies after publication to the exclusion of others is the creature of statute. Palmer v. De Witt, 47 N. Y. 532–536, 7 Am. Rep. 480. Compliance with the statutory provision of publication deprives the owner of his common-law right. But, as the statute was enacted for his protection, the mode of publication or the question as to what amounts to publication must correspond to the nature of the right secured. Drone on Copyright, 287.

Publication of a subject of copyright is effected by its communication or dedication to the public. Such a publication is what is known as a "general publication." There may be also a "limited publication." The use of the word "publication" in these two senses is unfortunate and has led to much confusion. A limited publication of a subject of copyright is one which communicates a knowledge of its contents under conditions expressly or impliedly precluding its dedication to the public. Abernethy v. Hutchinson, 3 L. J. Ch. 209; Nichols v. Pitman, 26 L. R. Ch. Div. 374; Caird v. Sime, 12 L. R. App. Cas. 326; Tomkins v. Halleck, 133 Mass. 32, 43 Am. Rep. 480; Palmer v. De Witt, 47 N.

Y. 532, 7 Am. Rep. 480; Turner v. Robinson, 10 Ir. Ch. Rep. 121, 135; Laura Keene v. Wheatley & Clarke, 9 Am. Law Reg. 33–80, Fed. Cas. No. 7,644. "In cases of literary, scientific, and professional treatises in manuscript, it is obvious that the author must be deemed to possess the original ownership and be entitled to appropriate them to such uses as he shall please. Nor can he be justly deemed to intend to part with that ownership by depositing them in the possession of a third person, or by allowing a third person to take and hold a copy of them. Such acts must be deemed strictly limited, in point of right, use, and effect, to the very occasions expressed or implied, and ought not to be construed as a general gift or authority for any purposes of profit or publication to which the receiver may choose to devote them." Story on Equity, § 943. The one is a dedication, the other is a mere license, to the public. From the one an abandonment of the incorporeal hereditament is implied; in the other is implied the reservation of its enjoyment. The test is whether there is or is not such a surrender as permits the absolute and unqualified enjoyment of the subject-matter by the public or the members thereof to whom it may be committed.

The nature of the property in question in large measure determines the extent of the public right. Thus, in case of a book, ordinarily the sole practical benefit to the author is in the right to multiply copies. The exhibition or private circulation of the original or of printed copies is not a publication, unless it amounts to a general offer to the public. The unrestricted offer of even a single copy to the public implies the surrender of the common-law right. Wheaton & Donaldson v. Peters & Grigg, 8 Pet. 591, 8 L. Ed. 1055. The author of dramatic compositions is entitled to the profit arising from public delivery or performance, to the sale of the manuscript, and to the printing and publishing of it. Palmer v. De Witt, supra; Macklin v. Richardson, Ambler, 694. On this capacity for public representation, as distinguished from the publication of other literary productions, the courts have founded the rule that such public exhibition is not a general publication. By admission to such exhibition the general public acquire no right to reproduce the composition, either by taking notes or by the exercise of the memory. The spectator is entitled to the enjoyment of the exhibition, but there is no implication of abandonment by the author of his title, or of surrender of the rights attached to his creation. The spectator, in paying for his ticket of admission, has not paid for any right to get possession of the play for subsequent representation. Tomkins v. Halleck, 133 Mass. 43, 43 Am. Rep. 480. The same rule applies to lectures orally delivered. Bartlett v. Crittenden, 5 McLean, 32, Fed. Cas. No. 1,076; Nichols v. Pitman, supra. In such cases, even where the hearers were allowed to make copies for their personal use, such license was limited to such individuals for the purpose of their own information, and they could not publish for profit that which they had not obtained the right of selling. Abernethy v. Hutchinson, supra. This settled doctrine, then, rests upon these grounds: The right secured by statute is the exclusive one of multiplying copies after publication. In the case of dramatic compositions the right of public representation also is protected. The character of the exhibition or disclosure for

amusement or instruction is prohibitive of any suggestion of a general publication, and implies the limitation of the public right.

The result of an examination of the authorities seems to show that the following propositions are established: A general publication consists in such a disclosure, communication, circulation, exhibition, or distribution of the subject of copyright, tendered or given to one or more members of the general public, as implies an abandonment of the right of copyright or its dedication to the public. Prior to such publication, a person entitled to copyright may restrict the use or enjoyment of such subject to definitely selected individuals or a limited, ascertained class, or he may expressly or by implication confine the enjoyment of such subject to some occasion or definite purpose. A publication under such restrictions is a limited publication, and no rights inconsistent with or adverse to such restrictions are surrendered. Restrictions imposed upon the use prior to publication protect the copyright. Such restrictions imposed after publication cannot affect the public rights acquired by reason of the fact of publication. The nature of the subject-matter, the character of the communication, circulation, or exhibition, and the nature of the rights secured, are chiefly determinative of the question of publication. Thus, the oral lecture to a class of students is not published even by permission to the individuals of such class to make copies for their own use, because this is in accord with the purposes of instruction and does not otherwise injuriously affect the right of the author. But the exhibition of a play to persons paying admission does not permit them to make copies for reproduction, because the character of the exhibition for amusement indicates the limitation of its purpose, and the reproduction thereof, by persons admitted only as spectators would be destructive of the other rights possessed by the author, including that of representation secured to him by statute.

It is not perceived how the legal status of a right of copyright in a painting or statue, so far as concerns their publication, can be distinguished from that of lectures or dramatic compositions. In fact, such distinctions as may be suggested only serve to strengthen the presumption of limited publication in favor of the work of art. There the author may wish to enjoy the profit from exhibition of the original and from the right to publish copies, but his chief object often is to secure the profit arising from the sale of the original work. The exhibition of a work of art for the purpose of securing a purchaser or an offer to sell does not adversely affect the right of copyright; and from the fact that the right protected by statute in a work of art is that of copying and not of exhibiting is derived the general rule that the mere exhibition thereof is not a general publication. Drone on Copyright, 287. There may be a sale of the subject of copyright separate and distinct from the sale of the copyright therein. Stephens v. Cady, 14 How. 528, 14 L. Ed. 528; Stevens v. Gladding, 17 How. 447, 15 L. Ed. 155; Werckmeister v. Springer Lithographing Co. (C. C.) 63 Fed. 808. In a limited exhibition, as of a play, there is no dedication to the public, no presumption or recognition of a right to copy, and therefore no abandonment of said right. In the case at bar not only was there no presumption of a right to copy, but there was an express denial of

such right. Whether said exhibition would have amounted to a pub-lication in the absence of any such prohibition is immaterial to the disposition of this case, and upon that question we express no opinion.

We have not been referred to a single authority which holds that such an exhibition as the one here in question is a general publication. The reasoning and conclusions reached in the cases bearing on this question strongly support the view that the right of copyright in works of art is not affected by a restricted exhibition. Thus in Turner v. Robinson it was held that an exhibition of a painting for the purpose of obtaining subscribers to an engraving thereof was not a publication. In this case defendant was enjoined from making copies of a painting where copying was prohibited by advertisement. 10 Ir. Ch. Rep. 121. To the same effect is the decision in Prince Albert v. Strange, 1 Mac. & G. 23, 2 DeG. & Sm. 652. And in Parton v. Prang, 3 Cliff. 537, Fed. Cas. No. 10,784, Mr. Justice Clifford held that:

"A painter also has at common law the same right before publication to prevent any person from copying it; * * * and his assignee has the same right before publication to prevent another from multiplying copies of it or reproducing the picture."

The cases cited by counsel for defendants in support of his argument that this exhibition was a publication have only a remote bearing upon the question involved herein. They relate, with one exception, to instances where there was a general publication of a book by its delivery, or an offer of delivery under a sale or lease to the general public; that is, to all persons who chose to accept it, accompanied by a personal contract between the owner and the purchaser or lessee imposing restrictions upon its use. Referring to such cases Chief Judge Parker says in Jewelers' Mer. Agency v. Jewelers' Pub. Co., 155 N. Y. 241, 49 N. E. 872, 41 L. R. A. 846, 63 Am. St. Rep. 666, as follows:

"The leasing of a book for a year or a term of years to any and all persons who will accept it on the author's terms, even if those terms include an agreement not to disclose its contents, constitute a publication. If a book be put within the reach of the general public, so that all may have access to it, no matter what limitations be put upon the use of it by the individual subscriber or lessee, it is published, and what is known as the common-law copyright or right of first publication is gone."

Judge Parker further holds that publication is proved—

"By the fact that by the delivery, whatever the occasion for it, the public or an indefinite portion of it were assured of access to the book without further action on the part of the author."

He then refers to the cases "in which there was a private circulation for a restricted purpose," and says:

"The distinction is in the limit of the circulation. If limited to friends and acquaintances it would not be a publication; but if general, and not so limited, it would be. Coppinger on Copyright, p. 117."

He then distinguished the case before him on the ground that:

"In this case the circulation was not limited to friends and acquaintances, or even to a class. The limitation was upon the character of the use which a subscriber could make of it."

So in Larrowe-Loisette v. O'Loughlin (C. C.) 88 Fed. 896—

"the book was exposed for sale, so that the public without discrimination as to persons might have an opportunity to enjoy it."

In Ladd v. Oxnard (C. C.) 75 Fed. 705, Judge Putnam said:

"While the nature of the use of the complainants' book was sought to be limited, there was no limit placed by the complainants on the extent or number of persons to whom the book might be distributed under the conditions which they had provided."

And in Rigney v. Dutton (C. C.) 77 Fed. 176, Judge Lacombe holds that a cut was published by being printed in—

"a weekly newspaper which circulates freely among all who choose to pay the subscription, whether they are in the stationery trade or not."

It is to be observed that in Jewelers' Mer. Agency v. Jewelers' Pub. Co., supra, three of the judges concurred in the result upon the special ground that the deposit of two copies of the book with the librarian of Congress constituted a publication thereof. And it may be claimed that the foregoing decisions, holding that publication is shown by a delivery of books to subscribers under conditions as to use, are contrary to the doctrine that the delivery of a lecture to a class under conditions as to use of copies is not a publication. But here there is in the first place the distinction pointed out by Mr. Justice McLean, in Bartlette v. Crittenden, 4 McLean, 300, Fed. Cas. No. 1,082, that there is no consent that the manuscript should be printed. "They [the students] have no right to a use which was not in the contemplation of the complainant or of themselves when the consent was first given."

Again, it is to be noted that in the one case the possession of the printed book, the subject of copyright, is surrendered, in the other there is no surrender of possession, and no one is admitted to listen to the lecture except upon a condition imposed prior to the communication. But the distinction between a public circulation of written copies and a restricted or private communication of their contents has existed from the earliest times and was for some purposes recognized before the use of printing. Keene v. Clarke, 9 Am. Law Reg. 33–64, Fed. Cas. No. 7,644. "The author's right of property in his unpublished work being undoubted, it has also been settled that he may communicate it to others under such limitations as will not interfere with the continuance of the right. 'He has,' as was said by Lord Broughton in Jefferys v. Boosey, 'the undisputed right to his manuscript. He may withhold or he may communicate it, and, communicating it, he may limit the number of persons to whom it is imparted, and impose such restrictions as he pleases upon their use of it. The fulfillment of the annexed conditions he may proceed to enforce, and for their breach he may claim compensation.' He cannot print and sell without publishing his work, but he may legitimately impose restrictions which will prevent its publication, whether the communication be made by giving copies for private perusal or by recitation before a select audience. In the latter case the retention of the author's right depends upon its being either a matter of contract or an implied condition, that the audience are admitted for the purpose of receiving instruction or amusement, and not in order that they may take a full note of what they hear, and publish it for their own profit, and for the information of the public at large." Caird v. Sime, 12 App. Cas. 326, 344.

In Press Pub. Co. v. Monroe, 73 Fed. 196, 19 C. C. A. 429, 51 L. R. A. 353, this court had occasion to consider the common-law right of an

author to his unpublished work in a case where a newspaper surreptitiously obtained and, without the consent of the author, published a copy of her ode to be delivered at the World's Fair at Chicago. There the court recognized the doctrine of restricted publication, and protected the rights of the author, although copies of the ode had been previously distributed. Judge Lacombe, delivering the opinion of the court, said:

"The copies which were given to the members of the committee on ceremonies and to a so-called 'Literary Committee' were delivered to them solely to enable them to decide whether the poem was one suitable and worthy of their acceptance as the ode to be delivered at the opening exercises. Such a delivery of copies of a literary production is not a publication, and could not prejudice the owner's common-law rights. Bartlette v. Crittenden, 4 McLean, 300, Fed. Cas. No. 1,082; Bartlett v. Crittenden, 5 McLean, 32, Fed. Cas. No. 1,076."

The decisions in Larrowe-Loisette v. O'Loughlin (C. C.) 88 Fed. 896, Ladd v. Oxnard (C. C.) 75 Fed. 703, and Callaghan v. Myers, 128 U. S. 617, 9 Sup. Ct. 177, 32 L. Ed. 547, are in harmony with the views already expressed herein.

In Werckmeister v. Pierce & Bushnell Mfg. Co. (C. C.) 63 Fed. 445, Judge Putnam held that:

"A mere exhibition of a picture in a public gallery does not at common law forfeit the control of it by the artist or the owner, unless the rules of the gallery provided for making copies, of which there is no evidence in this case."

It is true that this decision was reversed by the Court of Appeals in the First Circuit by a divided court. But the opinion appears to be based on the assumption, in the absence of proof that copying was prohibited, that the painting was publicly exhibited and, therefore, published within the meaning of the copyright act.

The same distinctions are observed and the same rules applied in the cases where statutory copyright has been obtained. This branch of the subject is fully discussed in the opinion of this court in Harrison v. Maynard, Merrill & Co., 61 Fed. 689, 10 C. C. A. 17. There the owner of the copyright, supposing that a fire had destroyed the commercial value of the sheets of his book stored in a bookbinder's cellar, permitted him to sell them, and the vendee resold them under an express agreement that they should be utilized as paper stock only. The court held that the copyright owner, who had transferred the title, could not by virtue of the copyright statute enjoin the purchaser from binding and selling such sheets in violation of said agreement. And the court refers to Henry Bill Publishing Co. v. Smythe (C. C.) 27 Fed. 914, as illustrating the distinction between the remedy in case of an unauthorized sale where the owner has retained the title, and an authorized conditional sale where the purchaser has violated the condition. There, the plaintiff published Blaine's Twenty Years of Congress, and sold it through book agents, by subscription only, to individual buyers. The defendant, knowing this fact, bought them from a book dealer, who had bought them from a book agent. The court enjoined the sale of these copies, and held that the statute protected the owner of the copyright in the exercise of his exclusive right to make such sales to individual subscribers through agents having no title. But the court

further said that, when the copyright owner actually sold the book to canvassers upon their agreement to sell by subscription only, he lost the protection of the copyright act. "Whenever he parts with that ownership, the ordinary incident of alienation attached to the particular copy parted with, in favor of the transferee."

In Falk v. Gast Lithograph & Engraving Co., 54 Fed. 890, 4 C. C. A. 648, this court had occasion to consider the question of publication of photographs, which were works of art within the decision in Burrow Giles Lithographic Co. v. Sarony, 111 U. S. 53, 4 Sup. Ct. 279, 28 L. Ed. 349, under the copyright statute. The proprietor of certain copyrighted photographs had sent out to retail dealers for their inspection an exhibition card containing copies, greatly reduced in size, of 100 of such copyrighted photographs, but without the statutory notice of copyright impressed thereon, from which the dealers were to order the particular cabinet photographs which they wished to purchase. This court held that said card was not a published edition of said photographs, and said:

"The statutes refer to a published edition, which is an edition offered to the public for sale or circulation. An exhibition of a card of miniature samples to the dealers alone, for the purpose of enabling them to give orders, is not a published edition, within the meaning of the statute."

It must be conceded that the author of a work of art does not lose his common-law copyright by exhibition in his studio for purposes of sale, and that the same rule would be applied to an association of artists exhibiting their work in a common gallery solely for this purpose. In the case at bar, both of the restrictions of class and purpose considered above were imposed upon those who were admitted to the Royal Academy. The limit of free admissions was to the members and their guests. The limitation to the public was upon the payment of an admission fee. The extent of the publication to such members of the public as chose to pay the fee was a permission to view the exhibition, but a prohibition to make any copies of the paintings therein. This prohibition clearly expressed the limitation implied in the private lectures or the dramatic performance, namely, a prohibition of any use inconsistent with the purpose for which the exhibition was given. Whatever doubt there might have been if the limitation had been merely to an indefinite class, or the limitation as to purpose had been merely implied from the character of the exhibition, there can be no doubt where the limitation as to purpose is not only thus implied, but is expressed in the rules of the Academy, and is universally and uniformly enforced as against every member of the public. We conclude, therefore, that such exhibition did not amount to a general publication.

In this discussion we have considered only the issues presented by the plea, and have not gone into the question of the right of assignment before copyright, which was advanced on the argument.

The decree of the Circuit Court sustaining the defendants' plea and dismissing the bill is reversed, with costs, and the cause is remanded to the Circuit Court, with instructions to enter an order overruling the plea, with leave to answer the bill.