# Waring v. WDAS Broadcasting Station, Inc.

*Speiser & Speiser*, for plaintiffs.

*Carr & Krauss* and *William A. Schnader*, for defendant.

McDEVITT, P. J., January 16, 1936.—Plaintiff or complainant seeks to restrain respondent from broadcasting any phonograph records made, produced or created by him. Complainant is an orchestra conductor, which pursuit he has followed for more than 18 years, and, under a special arrangement with the RCA Victor Company, in the latter part of 1932, made certain victrola phonograph records which will be referred to in the discussion by name and number. These records were made with the distinct understanding with the RCA Victor Company that they were to be sold for customary home use and not to be used for broadcasting or any other commercial purposes. To carry out this limitation, the recording

company stamped upon said records "Not Licensed for Radio Broadcast". Regardless of this restriction, respondent, a Delaware corporation engaged in commercial radio broadcasting in the City of Philadelphia, did, on various occasions, use complainant's recordings in violation of the limitation stamped thereon.

At the trial of this case, prominent composers, theatrical producers, agents and managers, musicians and others well known to and identified with the theatrical and musical world testified that such use of complainant's records was very harmful both to his commercial worth and his artistic reputation; that said use would affect his contractual possibilities, and as such constituted unfair competition.

Complainant's contention has been that he has a property right in the product of his intellectual effort, and respondent's answer is that the sale of said records to the public is not only a publication, but a waiving of any right of property in the use of said records in any manner whatsoever.

Where legislation has not kept abreast with the advance of science, invention and the tangible or intangible product of intellectual effort, equity has always proven the bulwark of protection to conserve property rights and to prevent illegal exploitation of the efforts, ability and production of the discoverer, producer, scholar or inventor. Such famous inventions and discoveries as the telephone, phonograph, motion picture films, both silent and speaking, wireless, radio and the airplane all preceded legislation governing, controlling and protecting them, and, in the absence of legislation, equity took its place. As the inventor is a benefactor of mankind, so the performing artist is a creator and disseminator of the beauties of nature, of the aesthetic efforts of mankind, and, because of the benefits derived by the latter, must be aided, encouraged and protected.

But a decade ago, the radio was a hope. Today it has destroyed all artificial and real boundaries between states

and nations. It has outdistanced time and has bridged the watery chasm between continents. It is now a useful as well as a commercial property or entity and employs a vast number of performing artists, interpreters and commentators, all of whom bring amusement, education or culture into the homes of its users. These artists, whether they be talented or amateur, by their efforts assist in the dissemination of knowledge and news and in the development of trade and commercial enterprise, and their contribution to the cultural life of any community is incalculable. The radio has become the news source, the magazine, the press, the stage, the concert hall, the opera house, the lecture platform, the political rostrum and even the school of ethics and physical culture, of hygiene and domestic science. The radio carries to the loftiest and the lowliest education and information, and so to equity must look those who contribute to this most important adjunct of our daily life for protection against the unlawful invasion of their rights and the illegal exploitation of their talents.

To permit exploitation would of necessity bring retaliation, which could only result in the talented artists, whose works are now available for public consumption and the advancement of education, curtailing their efforts for their own protection, which would mean a contraction of the sphere of their activities. It would be against public policy, detrimental to the public interest and a deprivation of the public's enjoyment of the efforts of these talented persons to permit what is tantamount to confiscation of their intangible or incorporeal rights. Legislation may eventually catch up with the advance of science and the development of unusual natural talents, but, until it does, equity must keep free the channels of barter and trade, as well as protect the cultural and educational side of human endeavor and activity, for it has been well said, "Man does not live by bread alone".

The chancellor approaches the consideration of the important character of this case conscious of the far reach-

ing effect of his opinion and mindful of the fact that the distinction between corporeal and incorporeal property was established in the earliest days of our legal jurisprudence. Incorporeal property has always been defined as that which consists in legal right merely. The courts have always recognized the common-law right of property in all intellectual efforts; and the scope of that right with respect to its creator has extended protection to the latter, so that his performance or expression of talent could not be used to the detriment of his artistic reputation or his financial injury. Such artists have been protected from interference in their contractual relations, from unfair competition, and from the invasion of their privacy, to the end "that no one should be permitted to derive benefit or gain from the intellectual efforts of another without permission or account". In the discussion to follow, the chancellor will consider the disastrous effects that will follow illegal, unlawful and inequitable invasion of the intangible rights of the performing artist, with respect to his reputation, his financial rewards, the rights of the public and the sphere or scope of the contractual relationship of the respective contracting parties.

Equitable recognition and regulation of these rights can never be construed so that the mechanical performance of the efforts would be abolished or withdrawn or generally curtailed. Regulation is to be accepted in its customary and generally accepted meaning, and only such inferences can be drawn from the regulations as will legally protect the rights, tangible or intangible, corporeal or incorporeal, that are not now provided for by statutory law.

Considerable confusion has been caused by the misconstruction of performance and publication. Publication in many instances releases control of the intangible rights of the producer, but performance such as this complainant seeks to protect is not a publication in any sense or manner that could be classified with the publication of a book. His performance or contribution is in a strict sense a

creation of the artist, which cannot be completely dupli-
cated by another without mechanical means. His talent
and his personality are unique, and, because of that, have
a high monetary value. His interpretive production is as
personal to himself as his name, his photograph or his
signature; by his talents he is known to the world, and
by the same yardstick is his commercial value measured.
It is the unlawful appropriation of these talents and the
consequent deterioration of his commercial value that
brings this complainant into equity.

The defense, in a word, is that these rights of the com-
plainant have not been recognized by the courts. The law
of copyright has not yet thrown its cloak of protection
about the skill of such talented persons, and consequently
the reproduction by virtual theft of his performance or
interpretation is just as much an invasion of his privacy
as would be the tapping of the wires of one broadcasting
station featuring complainant for the purpose of sending
out, through another station, that rendition, interpreta-
tion or performance which originated in the studio of first
instance. Certainly, if a photograph of an individual may
be protected, and others restrained from using it for com-
mercial purposes, the law must look with equal favor
upon the definable, but intangible, talents of a private
individual.

Equity, since its inception, has been a flexible tribunal
extending its arm of protection to persons affected by
new conditions. The machine age has changed our mode
of living and has created new problems in the relations of
human beings one to another, and the law, while ever slow
to change, is ever ready to protect, and it must keep pace
with changing conditions either by its growth or extension
along legislative lines, or by its flexibility in equity. No
statutory protection exists for such a complainant, no
copyright can be obtained by him, and no civil or criminal
redress at law can give adequate relief.

He seeks not damages; he craves protection. Such
damages as might be estimated could never adequately re-

imburse an artist for talents that may be still incompletely developed, for compensation measured by such a yardstick would minimize the commercial benefits that may accrue in the future from even greater development of his talents and a consequent increase in popularity. Such invasion and illegal use of intangible talents are inroads upon the personality of such a person, which must be considered inviolate in equity. What is generally described as the right of "literary property" might encompass every point of controversy in this litigation. Courts both in England and in this country have always recognized the existence of such common-law property rights in intellectual and artistic property. Before the advancement of science and the invention of our modern devices, only authors of literary compositions needed the protection of the courts for their intellectual creations, but now the producer, the composer and the performer, by their development, are classified in the same sphere. It has always been the desire of the courts to protect "the product of mental labor". There has been no disposition to limit such protection to literary creations. The attitude of courts in all our States and in neighboring countries has been to extend their protection in order to protect the rights of all creators of intellectual products, including musical compositions, paintings, etchings, photographs, architectural plans and drawings.

Drone, an authority on copyrights, defines the source of all property, corporeal or incorporeal, as production, and applies the following doctrine to such intellectual property:

"Ownership, then, is created by production, and the producer becomes the owner. This principle is general, and covers all productions,—the whole field of labor. It cannot be applied to the produce of one kind of labor, and withheld from that of another. It matters not whether the labor be of the body or of the mind. The yield of both comes under the same fundamental principle of property, which recognizes no distinction between the poet and the

peasant in the ownership of their productions. No theory, no explanation, no consideration, has been advanced by the great writers to account for the inviolability of property in the produce of bodily labor, which does not apply with equal force and directness to property in the fruits of intellectual industry. No vital qualities have been assigned to one which are not equally inherent in the other. All the attributes and conditions marked out by Pufendorf as essential to the constitution of property are found in intellectual productions. In other words, neither in its origin nor in its essential qualities is literary property *sui generis;* but it is simply a division, a species, of general property. It is subject to all the fundamental rules governing the acquisition, possession, and transmission of property. It is acquired by labor, succession, gift, purchase; transmitted by sale, donation, bequest; lost by abandonment. It may be injured, stolen, borrowed and lent, mortgaged and pawned. It may be the subject of contract, bargain, trade, fraud. Published, it may be seized by creditors. Disraeli says you may fill warehouses and freight ships with it": Drone on Copyright, page 5.

It will be seen that the earliest criterion of property revolved about possession. It may be argued that the complainant's performance is not possessed by one who merely hears it, but, once that performance is reduced by mechanical means to a condition where it is capable of reproduction, it requires no argument to prove that such possession makes it property.

In Millar v. Taylor, 98 Eng. Repr. 201, 221 (1769), the court said:

"The present claim is founded upon the original right to this work, as being the mental labour of the author; and that the effect and produce of the labour is his. It is a personal, incorporeal property, saleable and profitable; it has indicia certa; for, though the sentiments and doctrine may be called ideal, yet when the same are communicated to the sight and understanding of every man, by the medium of printing, the work becomes a distinguish-

able subject of property, and not totally destitute of corporeal qualities."

So the test in such cases is not whether the thing is corporeal or incorporeal, not whether it is attached to a material substance, but whether it is capable of identification, so that exclusive ownership may be asserted.

The weight of the testimony of complainant's witnesses proves to the satisfaction of the chancellor that his interpretive performances are specifically recognizable as his own and individual interpretations.

A recent and important decision on the subject of fugitive or evanescent rights was that of International News Service v. The Associated Press, 248 U. S. 215, 240 (1918). Mr. Justice Pitney said:

"But in a court of equity, where the question is one of unfair competition, if that which complainant has acquired fairly at substantial cost may be sold fairly at substantial profit, a competitor who is misappropriating it for the purpose of disposing of it to his own profit and to the disadvantage of complainant cannot be heard to say that it is too fugitive or evanescent to be regarded as property. It has all the attributes of property necessary for determining that a misappropriation of it by a competitor is unfair competition because contrary to good conscience."

The weight of authority clearly indicates that every new and innocent product of mental labor must be protected. It makes no difference whether it is intangible or incorporeal, it is the outward expression of mental labor. Originality is not a necessary ingredient to constitute intellectual or artistic property, but certainly the unique and unusual aspects are.

In Universal Film Mfg. Co. v. Copperman et al., 218 Fed. 577, the court recognized the existence of the right of literary property in a photoplay of a performance of a scenario.

In Wood v. Boosey et al., 2 L. R. Q. B. 340 (1867), it was held that an arrangement of the score of an opera

for the piano constituted a new work which was entitled to protection. So also, has a translation from a foreign language: Fleron v. Lackaye, 14 N. Y. Supp. 292 (1891) ; or an arrangement or adaptation of existing materials: Aronson v. Baker, 43 N. J. Eq. 365 (1887) ; Walter et al. v. Lane, L. R. App. Cas. 539 (1900) ; been considered sufficiently original.

The case of Gramaphone Company and Tetrazzini v. State Finance, decided by the Tribunal Court of the City of Milan, Italy, on February 19, 1912, directly rules upon the character of an artist's performance. The question presented in that case was whether an agreement between the Gramaphone Company and Tetrazzini, under which the latter was to sing certain operatic selections for recording by the company, constituted a mere contract for services or a real transfer and assignment of incorporeal chattels and, therefore, subject to the tax statute in question. The court said:

"The contention appearing in Tetrazzini's pleadings that the record is subject to the copyright of the author of the music incorporated in such record is certainly correct—but the co-existence of this right with the right of the performer appears to be possible and even very reasonable, if it is considered that as a matter of fact the music printed upon the record and by means of the record reproduced is not the music written by the author, as it is in the case with the printed editions, but it is the music as it had been rendered by the artist in front of the receiving apparatus; and that the performance may be such as to reach the level of a real and actual work of art deserving protection at the hands of the law. A musical selection played on the violin, by Kubelik, or on the piano by Paderewski, or sung by the thundering voice of Tamagno . . . is not the same as the same selection sung by anybody else. The artistic personality of the performer is reflected in the performance which becomes a distinct product having a special value not only artistic but also pecuniary—so that the record incorporating this per-

formance necessarily belongs also to the performer who has created it."

Since Tetrazzini had by her contract expressly assigned all her rights as to the records, the court held the contract taxable as a transfer of an incorporeal chattel.

The report to Congress made by Representative Ellsworth, in 1830, and Representative Clay, in 1837, clearly recognized legal rights in an intellectual creator. Ellsworth, reporting from the committee on the Judiciary, Reports of Committees, Twenty-first Cong., 2d Sess. (1830-31), report no. 3, stated:

"Upon the first principles of proprietorship in property, an author has an exclusive and perpetual right, in preference to any others, to the fruits of his labor. Though the nature of literary property is peculiar, it is not the less real and valuable. If labor and effort in producing what before was not possessed or known will give title, then the literary man has title perfect and absolute, and should have his reward; he writes and he labors as assiduously as does the mechanic or husband-man. The scholar who secludes himself, and wastes his life, and often his property, to enlighten the world, has the best rights to the profits of those labors; the planter, the mechanic, the professional man, cannot prefer a better to what is admitted to be his own."

The reasons that prompted Henry Clay's report, made by a select committee consisting of Clay, Preston, Buchanan, Webster and Ewing: Twenty-fourth Congress, 2d Sess., February 16, 1837, accompanying S. B. 223; are as valid today as they were then. In that report, among other things, he says:

"That authors and inventors have, according to the practice among civilized nations, a property in the respective productions of their genius is incontestable; and that this property should be protected as effectually as any other property is, by law, follows as a legitimate consequence. Authors and inventors are among the greatest benefactors of mankind. They are often dependent, exclusively, upon their own mental labors for the means of

subsistence; and are frequently, from the nature of their pursuits, or from the constitutions of their minds, incapable of applying that provident care to worldly affairs which other classes of society are in the habit of bestowing. These considerations give additional strength to their just title to the protection of the law."

Thus we find that the complainant's renditions conform with all of the criteria of literary or artistic property. His is a "new and innocent work", and, although not completely original, complete originality is not required: 13 C. J. 952, see §11 (2), Universal Film Mfg. Co. v. Copperman et al.; Wood v. Boosey et al.; Fleron v. Lackaye; Aronson v. Baker, supra.

There may be some confusion as to the scope of the complainant's right to and interest in his intellectual production. No less an authority than 13 C. J. 949, states as follows:

"Exclusive Control. The owner of literary or intellectual property, like the owner of any other kind of property, may do what he will with his own; his right is absolute, and exclusive as against the world . . . If he chooses to keep his productions unpublished and private, he may do so, and he has his remedies to prevent or to redress an unauthorized publication. He has the exclusive right to make first publication. He also has the right of private circulation among such persons as he may designate, and may impose such conditions and restrictions as he pleases on their use of it. Any use or publication in disregard of such conditions or restrictions is an invasion of his property rights and will be redressed as such. The owner is entitled to all profit from any use of his production, so long as that use does not amount to a general publication".

This is consonant with the thought of Drone, who says, at page 102, 103, in his recognized authority on copyright:

"The property of an author in his intellectual production is absolute until he voluntarily parts with all or some of his rights. . . . He has a right to exclude all persons from its enjoyment; and, when he chooses to do so, any

use of the property without his consent is a violation of his rights."

This right in etchings was recognized in the case of Prince Albert v. Strange et al., 2 De G. & S. 652, 64 Eng. Repr. 293 (1849). The right to restrain the production of plays was discussed in Ferris v. Frohman, 223 U. S. 424 (1912) ; Crowe v. Aiken, 2 Biss. 208 (1807) ; Palmer v. De Witt, 47 N. Y. 532 (1872) ; Tompkins et al. v. Halleck, 133 Mass. 32 (1882).

For more than one hundred years the courts have recognized the common-law right of the creator of intellectual or artistic property, which does not come within the purview of the Copyright Act, as being perpetual: See Millar v. Taylor, supra. The Court of King's Bench decided in that case that the author of a literary composition had an absolute property in his creation which entitled him to prevent others from copying or using it; that this property right continued indefinitely and was unaffected by the publication of his book; that the enactment of a statute protecting him from an unauthorized publication of his book did not deprive the author of his common-law rights. See also Donaldsons v. Becket et al., 4 Burr. 2408 (1774), 98 Eng. Repr. 257.

While the law laid down in Wheaton et al. v. Peters et al., 8 Pet. (33 U.S.) 591, differs somewhat from that above cited, in Holmes v. Hurst, 174 U. S. 82, 85 (1899), the Supreme Court upheld the doctrine laid down in Donaldsons v. Becket and said the law in Wheaton v. Peters was the same. The court said:

"An act similar in its provisions to the statute of Anne was enacted by Congress in 1790, and the construction put upon the latter in *Donaldsons* v. *Becket,* was followed by this court in *Wheaton* v. *Peters,* 8 Pet. 591. While the propriety of these decisions has been the subject of a good deal of controversy among legal writers, it seems now to be considered the settled law of this country and England that the right of an author to a monopoly of his publications is measured and determined by the copyright act—

in other words, that while a right did exist by common law, it has been superseded by statute."

Broad as the copyright laws are supposed to be, it was necessary for Congress to enact the amending Act of August 24, 1912, 37 Stat. at L. 488, in order to protect motion pictures. In the absence of such an enactment to protect productions, interpretations or creations analogous to those of complainant, equity is his only haven of safety.

The courts have been careful to differentiate between publication and performance. These are not synonymous or interchangeable terms.

In Fonotipia Limited et al. v. Bradley, 171 Fed. 951, the Circuit Court for the Eastern District of New York protected plaintiff against the unauthorized making and selling of copies of plaintiff's records, although the original records had been sold indiscriminately to the public for years. Nowhere in the court's opinion is to be found any intimation that this constituted a "publication" of plaintiff's literary property which was there protected.

Particularly analogous to the instant case in this connection is the case of Universal Film Mfg. Co. v. Copperman et al., supra. There the Nordisk Film Company took a motion picture of a performance of an original scenario which they had composed. From the negative film thereby obtained, positive films were afterwards printed and sold to anyone who chose to buy. Defendants purchased one of the positive films through a dealer in England and brought it to this country, renting it out for the purposes of exhibition. Subsequently the Nordisk company copyrighted the photoplay here, assigned the copyright to plaintiff, who brought this action against defendant for infringement. The district court, in 212 Fed. 301 (1914), held for defendant on the ground that in selling the films to any who would buy them the Nordisk company had published the photoplay and consequently could not validly copyright it in the United States. The circuit court of appeals affirmed the judgment of the district court but, in its

opinion, the appellate court very carefully made it clear that it did not agree with the reasons given by the court below for its decision. The court said, at pages 579 and 580:

"The title of the Nordisk Company in England was its common-law right of property in the intellectual conception of the scenario of the play expressed in words and in the intellectual conception of the photoplay expressed in actions. It could perform the written play itself, or license others to perform it, without prejudice to its common-law ownership, and so it could itself perform and license others to perform the photoplay in the same way. Palmer v. De Witt, 47 N. Y. 532, 7 Am. Rep. 480; Werckmeister v. American Lithographic Co., 134 Fed. 321, 69 C. C. A. 553, 68 L. R. A. 591, affirmed 207 U. S. 284, 28 Sup. Ct. 72, 52 L. Ed. 208, 12 Ann. Cas. 595.

"When it sold a positive film, which was the only means of performing the play, it conferred the performing right on the purchaser and his assigns. No one, by virtue of that sale, would acquire the right to re-enact the play and take a negative of it, or make, if that could be done, a new negative from the positive film. This would be inconsistent with the Nordisk Company's common-law property in the photoplay and with the mere performing right which it had conferred on the owner of the film. . . .

"The Nordisk Company abandoned its common-law property in the United States when it took out the statutory copyright . . . Sale of positive films after copyright was as consistent with its statutory ownership as was the sale of films before copyright with its common-law ownership. But neither it nor its assigns as owner of the statutory copyright in this country, could repudiate the license it had given before copyright to the purchaser of the film in England and his assigns. Therefore the defendants cannot be treated as infringers."

The leading case on the question of publication is Werckmeister v. American Lithographic Co. et al., 134 Fed. 321. Judge Townsend said, at page 324:

"Publication of a subject of copyright is effected by its communication or dedication to the public. Such a publication is what is known as a 'general publication'. There may be also a 'limited publication'. The use of the word 'publication' in these two senses is unfortunate and has led to much confusion. A limited publication of a subject of copyright is one which communicates a knowledge of its contents under conditions expressly or impliedly precluding its dedication to the public. . . .

"In a limited exhibition, as of a play, there is no dedication to the public, no presumption or recognition of a right to copy, and therefore, no abandonment of said right."

The circuit court of appeals in Associated Press v. International News Service, 245 Fed. 244, 251, in discussing this question, said:

"Thus it appears that not all publications are alike, and this is true, even under the Copyright Acts. In Werckmeister v. American, etc., Co., 134 Fed. 321, 69 C. C. A. 553, 68 L. R. A. 591, an opinion by Townsend, J. . . . that learned judge said that the use of 'publication' without explanation or qualification was unfortunate. 'The nature of the property in question in large measure determines the extent of public right'. And it was held that unless there was an 'abandonment of copyright or dedication to the public', the owner of a thing capable of copyright could 'expressly or by implication confine the enjoyment of such subject to some occasion or definite purpose.' "

It is, therefore, apparent that common-law literary property rights are not lost unless the act claimed to be a publication is indicative of an intent to abandon or dedicate to the public.

Again in International News Service v. The Associated Press, 248 U. S. 215, 240, the court said:

"Abandonment is a question of intent, and the entire organization of the Associated Press negatives such a purpose (i. e., complete abandonment) . . . The practical needs and requirements of the business are reflected in

complainant's by-laws . . . Their effect is that publication by each member must be deemed not by any means an abandonment of the news to the world for any and all purposes, but a publication for limited purposes; for the benefit of the readers of the bulletin or the newspaper as such; not for the purpose of making merchandise of it as news".

In discussing publication, the court said, in Stern v. Rosey, 17 App. D. C. 562, 564 (1901):

"We cannot regard the reproduction, through the agency of the phonograph, of the sounds of musical instruments playing the music composed and published by the appellants, as the copy or publication of the same within the meaning of the act. The ordinary signification of the words 'copying', 'publishing', etc., can not be stretched to include it.

"It is not pretended that the marks upon the wax cylinders can be made out by the eye, or that they can be utilized in any other way than as parts of the mechanism of the phonograph.

"Conveying no meaning, then, to the eye of even an expert musician and wholly incapable of use save in and as part of a machine specially adapted to make them give up the records which they contain, these prepared wax cylinders can neither substitute the copyrighted sheets of music nor serve any purpose which is within their scope. In these respects there would seem to be no substantial difference between them and the metal cylinder of the old and familiar music box; and this, though in use at and before the passage of the copyright act, has never been regarded as infringing upon the copyrights of authors and publishers."

It was contended that the sale of such records as those in question conveyed complainant's common-law right of literary property. This view is erroneous: See American Tobacco Co. v. Werckmeister, 207 U. S. 284 (1907).

The law has always recognized the distinction between corporeal and tangible substance and incorporeal or in-

tangible substance. Intangible and incorporeal property has a different and independent right, detached from the corporeal property, and is capable of existing, being owned or transferred independent of the other: See Stephens v. Cady, 55 U. S. 528, and Stevens v. Gladding et al., 58 U. S. 447.

The restriction placed upon the use of the records in question, to wit, "Not Licensed for Radio Broadcast", is of the utmost importance in controlling their use. The mere fact of possession carries no right to use for broadcasting. Equity has restrained the publication of letters, even though the recipient of the same had possession, for in the writer the law always recognizes an indefeasible right: Pope v. Curl, 2 Atk. 341, 26 Eng. Repr. 608; Hopkinson v. Lord Burghley, 2 L. R. Ch. App. 447; Dock v. Dock, 180 Pa. 14; Barrett v. Fish, 72 Vt. 18.

So the courts, in the cases above cited, have ruled flatly on the property right in letters, maps, lectures and news, and the weight of authority is that the ownership of a particular chattel does not carry with it the incorporeal rights of its artistic creator. The creator must in all instances consent to the transfer of such rights. In many cases that have been decided concerning this broad question, the controlling factors were such that the equitable servitude did not receive the careful consideration that it merited. Speaking of the handicap in many of these cases, Mr. Chafee, in his exhaustive article "Equitable Servitudes on Chattels", in 41 Harvard L. R. 945, 956, said:

"As we examine the cases one fact is significant—the discussion turns very little on our main problem, the validity of the doctrine of equitable servitudes on chattels. Our question is, may the original seller reach a remote purchaser who was not a party to the original sale but took with notice of the restriction? Where land is involved such a suit is made possible by *Tulk* v. *Moxhay*. The issue of the extension of this principle to chattels has not been squarely treated in the cases because it has

usually been interlocked with two other questions of great difficulty. In several important decisions in this country, relief was denied because the particular restrictions involved were held invalid for restraint of trade. In other leading cases involving a patented article or a copyrighted book, the suit to enforce the restriction was not based on a purely equitable or contractual obligation, but was brought under the exclusive jurisdiction of the United States courts over patents and copyrights; and the refusal of relief was put mainly on the ground that the violation of the restriction was not an infringement of the plaintiff's statutory monopoly. In cases of these two types, the court occasionally denied the existence of equitable servitudes on chattels altogether, but it is clear that such a denial was not necessary to the decision. Consequently, we may still ask whether it is possible to find a case where the restriction does not involve restraint of trade and then consider whether it is enforceable as an equitable servitude in the state courts or in the federal courts in a case involving diversity of citizenship."

The doctrine that the contract or covenant follows the chattel is discussed and decided in Lord Strathcona Steamship Co., Limited, v. Dominion Coal Co., Limited, decided by the Privy Council, (1926) L. R. App. Cas. 108. See also P. Lorillard Co. v. Weingarden, 280 Fed. 238; Murphy et al. v. Christian Press Association Publishing Co. 38 App. Div. 426, 56 N. Y. Supp. 597; Montgomery Enterprises et al. v. Empire Theatre Co., 204 Ala. 566, 86 So. 880; In re Waterson, Berlin & Snyder Co., Fain et al. v. Irving Trust Co., 48 F. (2d) 704; In re Rider et al., 16 R. I. 271, 15 Atl. 72 (1888) ; Great Lakes & St. Lawrence Transportation Co. et al. v. Scranton Coal Co., 239 Fed. 603.

The United States Supreme Court decided clearly and conclusively, in Herbert et al. v. The Shanley Co., 242 U. S. 591, 594 (1917), that performance was not such publication as infringed the right of the owner to perform

for profit. Speaking for the court, Mr. Justice Holmes said:

"The defendants' performances are not eleemosynary. They are part of a total for which the public pays, and the fact that the price of the whole is attributed to a particular item which those present are expected to order, is not important. It is true that the music is not the sole object, but neither is the food, which probably could be got cheaper elsewhere. The object is a repast in surroundings that to people having limited powers of conversation or disliking the rival noise give a luxurious pleasure not to be had from eating a silent meal. If music did not pay it would be given up. If it pays it pays out of the public's pocket. Whether it pays or not the purpose of employing it is profit and that is enough."

While there are many important features of this complainant's contention, the unfair competition phase should not be overlooked. To permit such a company as defendant to broadcast the product of his unique and unusual talents, by expending a trifling sum of 45 or 75 cents for the purchase of a record, places it on a level, in its appeal to the public, with this complainant, who commands a salary of $13,500 for the same performance in person. The result is obvious. The use of the tool or product of complainant places him in competition with himself, and it is perfectly obvious that if a sufficient number of broadcasting companies produce his concerts from their victrola records his popularity will wane, the demand for his services by the public will soon diminish, and his commercial worth decrease accordingly. Too much of anything becomes tiresome.

Equity has always required that persons engaged in business should evidence fair respect for the contracts of their competitors, and unfair competition has been defined as selling goods by means which shock judicial sensibilities. The common law likewise condemns the intentional interference with the contract rights of another as a tort: See Gonzales v. Kentucky Derby Co. et al., 197

App. Div. 277, 189 N. Y. Supp. 783 (1921); American Malting Co. v. Keitel, 217 Fed. 672.

There are innumerable judicial decisions determining what are known as "ticket scalper" cases, in which the original vendor has always successfully followed his chattel and controlled, to a certain extent, its use: Louisville & Nashville R. R. Co. v. Bitterman et al., 128 Fed 176, 144 Fed. 34, 207 U. S. 205 (1907); Nashville, Chattanooga & St. Louis Ry. Co. v. McConnell et al., 82 Fed. 65; Delaware, Lackawanna & Western R. R. Co. v. Frank et al., 110 Fed. 689 (C. C. W. D., N. Y., 1901).

In Bitterman v. Louisville & Nashville R. R. Co., 207 U. S. 205, 222 (1907), the court said:

"Any third person acquiring a non-transferable reduced rate railroad ticket from the original purchaser, being therefore bound by the clause forbidding transfer, and the ticket in the hands of all such persons being subject to forfeiture on an attempt being made to use the same for passage, it may well be questioned whether the purchaser of such ticket acquired anything more than a limited and qualified ownership thereof, and whether the carrier did not, for the purpose of enforcing the forfeiture, retain a subordinate interest in the ticket amounting to a right of property therein which a court of equity would protect. *Board of Trade* v. *Christie Grain & Stock Co.*, 198 U. S. 236, and authorities there cited. See also, *Sperry & Hutchinson Co.* v. *Mechanics' Clothing Co.*, 128 Fed. Rep. 800."

Equity has never permitted a competitor to enjoy the fruits of a breach of contract with the plaintiff, even though the defendant in question has been entirely innocent of any inducement of the breach: See A. Booth & Co. v. Davis et al., 127 Fed. 875; Fleckenstein Brothers' Co. v. Fleckenstein et al., 66 N. J. Eq. 252. Analogous cases are those concerning trading stamps. See Sperry & Hutchinson Co. v. Mechanics' Clothing Co., 128 Fed. 800, 135 Fed. 833; Sperry & Hutchinson Co. v. Temple, 137 Fed. 992; Sperry & Hutchinson Co. v. Louis Weber

& Co., 161 Fed. 219 (C. C., N. D., Ill. 1908) ; Sperry & Hutchinson Co. v. Benjamin et al., 221 Fed. 512; Sperry & Hutchinson Co. v. Fenster et al., 219 Fed. 755 (D. C., E. D., N. Y., 1915). In Sperry & Hutchinson Co. v. Mechanics' Clothing Co., 135 Fed. 833, 835, the court said:

"By reusing the stamp as an advertisement, they seek to get for nothing what others are required to pay for, and to institute a destructive competition with authorized mechants, which tends to destroy the value of the stamp and to injure the complainant's business.

"The trading stamp is an artificial creation. The company, having created it and having created a value for it, may dispose of it on such terms as it sees fit. It may in the first instance restrict the right to issue it for advertising purposes to such persons . . . as are willing to pay for it. The public is entitled to receive it upon the terms offered, namely, that it is exchangeable for goods. But, it is asked, why, if the right of a customer to transfer it is conceded, may he not transfer it in any mode he pleases, and give it as an advertisement if he sees fit? A sensible answer to this question, I think, is this: Because he thereby appropriates to himself the trading stamp company's legitimate share of the transaction."

In Sperry & Hutchinson Co. v. Louis Weber & Co., supra, p. 222, we find the following statement:

"It was open to defendant to issue its stamps and induce cash sales, just as complainant did, through another or on its own account. There was no need for it to prey upon complainant's trade."

And Sperry & Hutchinson Co. v. Fenster et al., supra, p. 757, contains the following:

"The right to redeem the stamps is a property right transferable by possession while the license to use them for advertising purposes is not transferable without compensation to the person granting that right, viz., the plaintiff herein."

In the instant case defendant has appropriated without purchase or legal claim the creation or material produced by complainant's intellectual effort and application of his unique talents. His creation represents production by organization, by the expenditure of labor, skill and money. His creative genius has perfected something peculiarly his own, stamped with his personality and as inseparable from him without injury as one of his limbs. His unique talents have fashioned something as distinct and original as the product fashioned by skilled hands and capable of handling. He has a product of his brain just as marketable as the finished work of a sculptor. And surely none will deny his legal right to protect such property.

Complainant, in the opinion of the court, has established a property right in his talents, efforts and interpretations. He has proven his artistic attainments and musical and unique talents. These characteristics individualize his performances and give them pecuniary as well as artistic value. It is apparent that his interpretive talents and creative talents, even though intangible, are entitled to protection. Such unauthorized and unlimited exploitation and appropriation of his creations would constitute an unlawful infringement of his legal and definable rights. The fact that such an interpretation can be captured or transcribed and then made capable of reproduction, establishes it as property. The integrity of his art should be preserved, and he should receive a return for the commercial utilization of his talents. His name, personality and reputation are legally protected from infringement. So should be his creative genius. The making of a record is not a publication of the same, and the authorities are all in accord on this question. An infringement is an invasion, and an invasion is a destruction which spells financial disaster to the artist and a shrinking of the benefits derived by the public from the creations of such persons, and, consequently, is a matter of public policy as well as legal right. The use of

the words "performance and publication" causes confusion, but there must be an abandonment which is a question of intent, to establish publication. Communication and dedication are as dissimilar as are performance and publication. Ownership suggests possession and proprietorship, and sale represents the conveyance of a right of any kind. At the same time, however, one may sell his corporeal and still save his incorporeal right. Undoubtedly the contract or covenant follows the chattel, and only a false legal doctrine could separate the same, which would be equivalent to putting the stamp of approval upon unfair competition. The complainant is, therefore, entitled to the redress that he seeks. Let the injunction issue. . . .

### Decree nisi

And now, to wit, January 16, 1936, upon consideration of the foregoing cause, it is ordered, adjudged and decreed that (1) respondent, WDAS Broadcasting Station, Inc., is hereby restrained and enjoined from using for broadcasting purposes, any records made and created by complainant, Fred Waring, and from the reproduction and performance of any such record for commercial use or profit; (2) Respondent must pay the costs; (3) The prothonotary is directed to enter a decree nisi accordingly; to notify counsel of the filing of findings of fact and conclusions of law, of the filing of this decree, and, unless exceptions are filed hereto within 10 days, he shall enter a final decree in accordance herewith.